James J. BUCKLEY, Plaintiff,

v.

REYNOLDS METALS
COMPANY, Defendant.

No. 86 Civ. 2077(RJW).

United States District Court,
S.D. New York.

June 21, 1988.

Vladeck, Waldman, Elias & Engelhard, P.C., New York City, for plaintiff; David Bruce Goldin, of counsel.

Epstein, Becker & Green, P.C., New York City, for defendant; Harry N. Turk, of counsel.

**ROBERT J. WARD, District Judge.**

Plaintiff James J. Buckley ("Buckley") filed the present action against defendant Reynolds Metals Company ("Reynolds") claiming unlawful discharge in violation of the Age Discrimination in Employment Act, 29 U.S.C. § 621 *et seq.* ("the ADEA"). A jury verdict for plaintiff awarding back pay and liquidated damages was upheld by the Court of Appeals for the Second Circuit. After further discovery, plaintiff applied to this Court for an award of front pay. For the reasons that follow, plaintiff's application is granted in part and plaintiff is awarded damages in the amount of $106,-401.53.

## BACKGROUND

Plaintiff was born in 1928 and was hired by Reynolds in 1959. He continued working for Reynolds until August 1984, when he was discharged at the age of fifty-six. Joint Proposed Pretrial Order, filed June 17, 1988, Stipulated Facts ¶¶ 1–3 ("Stipulated Facts"). At the time of his discharge, plaintiff was a sales representative for Reynolds' Mill Products Division in their Northeast district office located in Tarrytown, New York. Affidavit of David Bruce Goldin, filed March 7, 1988, ¶ 3 ("Goldin Aff."). On December 3, 1984 plaintiff filed a charge with the New York State Division of Human Rights, alleging that Reynolds had discriminated against him on the basis of his age in the termination of his employment. Stipulated Facts ¶ 5. After receiving his "right to sue" letter from the Human Rights Division, plaintiff filed this action March 10, 1986. *Id.* ¶ 6. During the pendency of the action, plaintiff took a position as a sales representative at T.E. Conklin Brass & Copper Co. ("Conklin"). Plaintiff began work at Conklin in October 1984 and is still employed there. *Id.* ¶ 4.

After the close of discovery, this Court conducted a trial by jury of plaintiff's claims. The trial commenced on December 17 and continued through December 22, 1986. The jury found that Reynolds had willfully discriminated against Buckley, and awarded Buckley $23,500 in back pay and an equal amount in liquidated damages. *Id.* ¶ 8. Accordingly, the Court entered a judgment on January 9, 1987 that plaintiff recover from defendant the sum of $47,000, together with prejudgment interest, costs and attorney fees. The Court's order further directed "that plaintiff be immediately reinstated into the position or a position satisfactory to both parties in the Northeast region substantially equivalent to the position he occupied before the termination of employment with the defendant." *Id.* ¶ 9. The Court of Appeals for the Second Circuit affirmed this Court's judgment, without opinion, on June 30, 1987. *Id.* ¶ 10.

In spite of ongoing negotiation between the parties, they were unable to agree to a position for plaintiff's reinstatement. On August 28, 1987, the parties stipulated that Buckley could seek an award of " 'front pay' or other appropriate relief in lieu of reinstatement." *Id.* ¶ 11. Thereafter, the parties conducted discovery on the issue of front pay, *id.* ¶ 12, and plaintiff's application for front pay is presently before the Court. The parties have agreed that the Court would decide the issue of front pay damages based on the stipulated facts, without a trial. Joint Proposed Pretrial Order at 14. *See Dominic v. Consolidated Edison Co.*, 822 F.2d 1249, 1258 (2d Cir. 1987) (award of front pay in ADEA action is a matter for the exercise of the trial judge's equitable discretion).

## DISCUSSION

### A. *Liability for Front Pay*

■■■ The purpose of the remedies authorized by the ADEA[1] is to make whole victims of age discrimination. *Whittlesey v. Union Carbide Corp.*, 742 F.2d 724, 727–28 (2d Cir 1984) (citing *Geller v. Markham*, 635 F.2d 1027, 1036 (2d Cir.1980), *cert. denied*, 451 U.S. 945, 101 S.Ct. 2028, 68 L.Ed.2d 332 (1981)). To further that goal, a district court may, in appropriate circumstances, award front pay to victims of age discrimination. *Id.* at 728.[2] The *Whittlesey* court delineated the circumstances under which a front pay award is appropriate, and these circumstances were restated by this Court in *Bonura v. Chase Manhattan Bank, N.A.*, 629 F.Supp. 353, 362 n. 3 (S.D.N.Y.), *aff'd per curiam*, 795 F.2d 276 (2d Cir.1986):

1. The enforcement provisions of the ADEA expressly authorize the district courts to grant an ADEA claimant
 such legal or equitable relief as may be appropriate to effectuate the purposes of [the ADEA], including without limitation judgments compelling employment, reinstatement or promotion, or enforcing the liability for amounts [owing as a result of the violation of the ADEA].
 29 U.S.C. § 626(b).

2. *Accord Wildman v. Lerner Stores Corp.*, 771 F.2d 605, 614 (1st Cir.1985); *Maxfield v. Sinclair*

An award of front pay presupposes, first, that reinstatement is either impossible or impracticable. Second, a front-pay award is appropriate and may even be necessary "in cases where the fact-finder can reasonably predict that the plaintiff has no reasonable prospect of obtaining comparable alternative employment." Finally, front pay may properly be awarded where calculation of both the plaintiff's likely mitigated earnings and the income the plaintiff likely would have earned if he or she had continued in the defendant's employ do not involve "undue speculation."

(quoting *Whittlesey;* citations omitted). After considering the facts of the case, the Court concludes that the *Whittlesey* criteria have been met and, in the exercise of its discretion, awards front pay to plaintiff.

### 1. *Reinstatement Impossible or Impracticable*

First, as required by *Whittlesey*, the Court finds that reinstatement of plaintiff was "impossible or impracticable." After the jury rendered its verdict in favor of plaintiff, this Court ordered that plaintiff be reinstated immediately to his old position or to a substantially equivalent position mutually acceptable to the parties in defendant's "Northeast region." The parties, though, were unable to agree on a mutually satisfactory position, and after eight months of negotiations they stipulated that plaintiff would seek an award of front pay. During this period defendant's counsel mentioned various positions that might be available to plaintiff, including an automotive sales job based in Detroit, which defendant had described at trial, and putative positions in Philadelphia and At-

*Int'l*, 766 F.2d 788, 795–96 (3d Cir.1985), *cert. denied*, 474 U.S. 1057, 106 S.Ct. 796, 88 L.Ed.2d 773 (1986); *E.E.O.C. v. Prudential Fed. Sav. & Loan Ass'n*, 763 F.2d 1166, 1172 (10th Cir.), *cert. denied*, 474 U.S. 946, 106 S.Ct. 312, 88 L.Ed.2d 289 (1985); *O'Donnell v. Georgia Osteopathic Hosp., Inc.*, 748 F.2d 1543, 1551 (11th Cir.1984); *Davis v. Combustion Eng'g, Inc.*, 742 F.2d 916, 923 (6th Cir.1984); *Gibson v. Mohawk Rubber*, 695 F.2d 1093, 1097, 1101 (8th Cir.1982); *Chancellier v. Federated Dep't Stores*, 672 F.2d 1312, 1319 (9th Cir.), *cert. denied*, 459 U.S. 859, 103 S.Ct. 131, 74 L.Ed.2d 113 (1982).

lanta. Goldin Aff. ¶¶ 4–6. The record is unclear as to the particulars of these positions, but the parties appear to agree that none of the positions offered were mutually satisfactory.

■ After discovery had commenced on the issue of front pay, defendant provided additional details concerning the Philadelphia position. *Id.* ¶ 7. Several circumstances render this position inappropriate for plaintiff. The position was outside the Northeastern region as defined when plaintiff was employed by Reynolds. It was, then, not within the scope of this Court's reinstatement order. Furthermore, defendants made clear in offering the position that it was vulnerable to elimination before plaintiff reached retirement age. The position would have required that plaintiff work for Lawrence O'Brien, the same man responsible for his dismissal. Finally, the Court is cognizant of the late date at which defendant provided plaintiff with the particulars of this position. *Id.* ¶ 8. In light of the foregoing, the Court concludes that plaintiff's rejection of the Philadelphia position was not unreasonable.[3] Defendant's failure to offer plaintiff a suitable position leads the Court necessarily to the conclusion that reinstatement was impossible or impracticable.[4]

2. *No Comparable Alternative Employment*

■ The Court must next determine whether plaintiff has any reasonable prospect of obtaining comparable alternative employment. In this case plaintiff has accepted a position and is currently employed at Conklin. Plaintiff's salary at Conklin is substantially less than what he received at Reynolds. In 1983, his last full year at Reynolds, plaintiff earned $41,233.46. Stipulated Facts ¶ 16. By contrast, plaintiff received a salary of $27,499.96 from Conklin in 1987. *Id.* ¶ 22. Defendant correctly points out that in assessing comparability, the Court must take into account, in addition to plaintiff's current salary, the pension he receives from defendant. *See Hagelthorn v. Kennecott Corp.,* 710 F.2d 76, 86–87 (2d Cir.1983) (approving district court's set-off of pension benefits received in calculation of back pay). Plaintiff currently receives from Reynolds an annual pension of $11,134.20, *id.* ¶ 23, which brings his 1987 income to $38,634.16.

■ A plaintiff's new job may be comparable to his or her old notwithstanding a moderate salary differential. *See Bonura v. Chase Manhattan Bank, N.A., supra,* 629 F.Supp. at 362 n. 3 (plaintiff's new position found comparable although his starting salary "was somewhat less than the salary he was drawing when he left [defendant]"). The net salary differential in this case, approximately $2,600 when plaintiff's pension benefits are accounted for, may be insufficient by itself to make plaintiff's position at Conklin not comparable to the position he lost at Reynolds. Be that as it may, when this salary differential is considered in conjunction with the wide range of benefits plaintiff has been de-

---

**3.** Defendant's reliance on *Ford Motor Co. v. E.E. O.C.,* 458 U.S. 219, 102 S.Ct. 3057, 73 L.Ed.2d 721 (1982) and *Dominic v. Consolidated Edison Co.,* 822 F.2d 1249 (2d Cir.1987) is misplaced. *Ford* holds only that when a defendant in a Title VII suit provides the plaintiff with an unconditional offer of the job that was previously denied, then the accumulation of back-pay damages is tolled. Putting aside the argument that a Title VII case may not be directly applicable to an ADEA action, *Ford* cannot offer any support for defendant, since it at no time offered plaintiff his old job back. In *Dominic* the Second Circuit declared in dictum that refusal of a "substantially equivalent" job amounts to a failure to mitigate damages and would preclude an award of front pay. *Id.* at 1258. This Court takes no exception to this general proposition, but, for the reasons stated above, concludes that

the positions offered to plaintiff were not "substantially equivalent" to the job he held prior to discharge.

**4.** The Court has not placed responsibility on defendant for its failure to reinstate plaintiff in a suitable position. Once a job action has been determined to have been in violation of the ADEA and the defendant has failed to reinstate the plaintiff, it is immaterial whether that failure was due to willfulness on the part of the defendant or to circumstances beyond its control. An illegally discharged employee is entitled to front pay so long as he or she has not unreasonably refused to accept a comparable position and has met the remaining *Whittlesey* criteria.

prived of as a result of his illegal discharge, the Court concludes, in the exercise of its equitable discretion, that plaintiff's position at Conklin is not comparable to the position he lost at Reynolds. *See Blum v. Witco Chem. Corp.,* 829 F.2d 367, 373, 374 (3rd Cir.1987) (Plaintiffs entitled to front-pay awards compensating them for lost pension benefits, notwithstanding higher salaries at new positions); *Nordquist v. Uddehohm Corp.,* 615 F.Supp. 1191, 1204 (D.Conn.1985) (comparison of salaries alone is not determinative of whether entire employment benefit package at plaintiff's new position is "comparable").

### 3. *No Undue Speculation*

The final *Whittlesey* criterion requires that the calculation of front pay damages not involve "undue speculation." This is not to say that any level of uncertainty in the calculation is forbidden. By its nature, an assessment of future damages will always involve some uncertainty. Moreover, defendant will not be heard to complain of uncertainty when that uncertainty has been caused by its own acts. *See, e.g., Koyen v. Consolidated Edison Co.,* 560 F.Supp. 1161, 1169 (S.D.N.Y.1983) (Weinfeld, J.) ("the wrongdoer shall bear the risk of the uncertainty which his own wrong has created").

Front pay awards have been considered unduly speculative in situations where the discharged employee is at the lower end of the protected class, that is, forty years old, and where an award may encompass ten years or more "during which the employee, had he not been unlawfully discharged but continued in his employment, 'might or might not get raises, reductions, fired or incapacitated.' " *Id.* at 1168 (citations omitted). Thus, in *Bonura v. Chase Manhattan Bank, N.A., supra,* 629 F.Supp. at 362 n. 3, front pay was denied where the plaintiffs sought awards covering eleven and

sixteen years, respectively, of prospective employment.

▮▮▮ In this case, plaintiff seeks an award to cover a nine year period, which under other circumstances might exceed the limits of permissible speculation under the ADEA. In light of the specific facts of the case, however, a grant of front pay is not inappropriate. *See Blum v. Witco Chem. Corp., supra,* 829 F.2d at 375–76 (where terminated employees were within eight years of normal retirement age, assumption that they would have remained with employer absent illegal discharge did not involve unreasonable speculation). Plaintiff worked for Reynolds for more than twenty-five years. When he was fired, he had nine years to work before retirement. There is no reason to reject plaintiff's assertion that he intended to remain at Reynolds until he reached the regular retirement age of sixty-five. *See* Affidavit of James J. Buckley, filed March 7, 1988 ¶ 4 ("Buckley Aff."). Furthermore, it falls within the scope of permissible speculation to assume that absent the illegal discharge, plaintiff would have been able to remain at Reynolds until he planned to retire.[5]

Plaintiff has obtained a new position at Conklin. In view of his age, it is unlikely that plaintiff will voluntarily switch jobs again or embark on a new career path. Finally, the industry where plaintiff is employed, though subject to some degree of reversal along with the rest of the national economy, provides relatively steady and dependable employment. Thus, the instant case is fundamentally different from *Rengers v. WCLR Radio Station,* 661 F.Supp. 649, 651 (N.D.Ill.1986), where the court declined to award front pay covering nine years of prospective employment to a disc

---

**5.** A general reduction in the work force is not in itself a valid defense to a claim for front pay. *Sims v. Mme. Paulette Dry Cleaners,* 638 F.Supp. 224, 233 (S.D.N.Y.1986). To be relieved of further liability, a defendant must establish by a preponderance of the evidence that the plaintiff would not have been retained in *some* capacity. *Archambault v. United Computing Sys., Inc.,* 786

F.2d 1507, 1515 (11th Cir.1986). In view of the undisputed facts of plaintiff's exemplary employment record and that defendant obtained all further reductions in its work force through voluntary attrition, Exhibit C annexed to Goldin Aff., the Court concludes that defendant has made an inadequate showing on this issue.

jockey in the "fickle" radio industry.[6] The Court is confident that, by using appropriate caution in its calculation of damages, it can adequately protect defendant's legitimate concern that it not be exposed to "undue speculation."

## B. *Damages*

Plaintiff seeks a front-pay award totalling $375,820 to compensate him for lost salary, pension and other benefits. Joint Proposed Pretrial Order, filed June 17, 1988, Plaintiff's Contentions of Fact ¶ 30 ("Plaintiff's Contentions"). When he was employed by Reynolds, plaintiff received a wide range of benefits that Conklin does not offer, including life insurance, dental insurance, vision insurance, employer con-tributions to his savings plan and five weeks annual paid vacation. The Court will discuss in turn each component of plaintiff's asserted loss.

### 1. *Lost Salary*

A front pay award for lost salary is calculated by measuring the difference between the amount of salary the plaintiff would have received absent the employer's discrimination and the salary he or she has earned or will earn in his or her present job. *E.E.O.C. v. Colgate–Palmolive Co.,* 612 F.Supp. 1476, 1479 (S.D.N.Y.1985); *Koyen v. Consolidated Edison Co., supra,* 560 F.Supp. at 1164. Plaintiff has based his $181,949 demand for lost salary on his 1983 salary at Reynolds, projecting annual 6.6% salary increases, which reflect the average annual increase he received over his last four years at Reynolds. Plaintiff's Contentions ¶¶ 3, 5.[7] Buckley then compared this projected salary to the salary he receives from Conklin. Plaintiff now has a

three year salary history at Conklin. His 1987 salary was $27,499.96, and his salary has increased an average of 3% each year while he has been with Conklin. *Id.* ¶ 7. However, plaintiff asserts that on account of a recent announcement by Conklin of a restructuring of salary schedules, his salary at Conklin is not expected to increase further between now and 1993, when plaintiff plans to retire. *Id.;* Buckley Aff. ¶¶ 12, 13. Plaintiff, then, has based his salary demand on his projected Reynolds salary less his current Conklin salary less the annual pension he now receives from Reynolds.

When calculating lost earnings, it is correct to include any pattern of increases in plaintiff's pre-discharge earnings. *Bonura v. Chase Manhattan Bank, N.A., supra,* 629 F.Supp. at 355; *Koyen v. Consolidated Edison Co., supra,* 560 F.Supp. at 1164. However, this projection of past increases into the future is only justified where it represents the best prediction available of what the plaintiff's salary would be had he or she not been dismissed. *Cf. Dominic v. Consolidated Edison Co., supra,* 822 F.2d at 1258 (in light of former employer's negative opinion of plaintiff, trial judge not required to find that plaintiff would have continued to receive steady pay increases had he not been discharged, and trial judge appropriately used salary at time of discharge to compute lost wages).

In this case, there are many indications that if plaintiff had remained with Reynolds his salary would not have continued to increase at the historical rate. Reynolds has reduced its sales staff markedly, and its remaining sales representa-

---

**6.** *Rengler* can be further distinguished from the case at hand. The *Rengler* court, in the end, based its denial of front pay on its conclusion that the jury's verdict of $194,866 for back pay and liquidated damages had fully compensated the plaintiff for the damages suffered from his illegal discharge. By contrast, in the instant case, plaintiff received a modest verdict of $47,-000, just slightly more than a single year's salary. Accordingly, the Court is unwilling to conclude that the jury verdict in the instant case for back pay and liquidated damages has fully compensated plaintiff for the loss suffered.

**7.** Plaintiff asserts that the 6.6% projected annual increase is conservative. He notes that over his entire twenty-five year career at Reynolds, he had averaged 6.9% annual increases, Plaintiff's Contentions ¶ 4, and that if the salary he received during his last eight months at Reynolds in 1984 is annualized and compared to his 1983 salary, it reflects an 11.5% increase in his final year.

tives have not in recent years been receiving wage increases anywhere near plaintiff's historical rate. Exhibit A, annexed to Goldin Aff.; Joint Proposed Pretrial Order, filed June 17, 1988, Defendant's Contentions of Fact ¶ 3 ("Defendant's Contentions"). Accordingly, in assessing plaintiff's claim for lost salary, the Court, in the exercise of its discretion, is entitled to use plaintiff's 1983 Reynolds salary as a benchmark. As discussed above, when plaintiff's 1983 Reynolds salary is compared to his current Conklin salary and his pension from Reynolds is included, the shortfall suffered by plaintiff amounts only to $2,600 per year. When considered in light of the manifold uncertainties and estimates employed in arriving at the figure, a projected salary shortfall of only $2,600 is insufficient to form the basis for an award of front pay. For all the foregoing reasons, plaintiff's application for an award of $181,949 to compensate him for lost salary is denied in its entirety.

### 2. Pension Benefits

In addition to compensation for lost salary, plaintiff seeks compensation for pension benefits he has lost as a result of his illegal discharge. An award for lost pension benefits is appropriate under the ADEA. *Blum v. Witco Chem. Corp., supra*, 829 F.2d at 373; *Bonura v. Chase Manhattan Bank, N.A., supra*, 629 F.Supp. at 358. Plaintiff calculates, based on his projection of continued 6.6% salary increases at Reynolds, that if he had remained at Reynolds until he reached the age of sixty-five, he would have been entitled to an annual pension of $26,104.18. Plaintiff's Contentions ¶ 6. Because of the discharge, however, plaintiff receives a pension from Reynolds of only $11,134.20. In addition, when he retires from Conklin at the age of sixty five, plaintiff will be eligible for a $2,745.60 annual pension, so that his total pension benefits from both employers will amount to $13,879.80. Based on these calculations, plaintiff seeks an award of $122,243 for lost pension benefits. *Id.* ¶ 19.

As stated above, the Court does not accept plaintiff's projection of continued salary increases if he had remained at Reynolds. The Court will base its consideration of plaintiff's pension request on his 1983 salary. Even in the event that plaintiff would not have received any salary increase during continued employment at Reynolds, his pension benefits would have increased solely as a result of his increased time of service.[8] Had he remained at Reynolds until his retirement at age sixty-five, assuming no salary increases, plaintiff would have been entitled to annual pension benefits from Reynolds of $19,014.53.[9] When compared to the level of benefits he can now expect upon retirement, $13,879.80, plaintiff has suffered a loss in pension benefits of $5134.73 per year.

This is a substantial loss directly attributable to defendant's illegal discharge of plaintiff. The Court arrived at the figure using a series of conservative assumptions which protect defendant from undue specu-

---

**8.** The formula used at Reynolds for calculating an employee's pension benefit upon retirement at the age of sixty-five is: (2% of the first $20,000 of the average annual salary of that employee's five highest annual salaries + 0.75% of the excess over $20,000 of the average annual salary of that employee's five highest annual salaries) X (years of service up to 35 years of service). Undisputed Facts ¶ 34.

**9.** The Court obtains this figure by assuming that plaintiff would have maintained his 1983 salary of $41,233.46 until his normal retirement at age sixty five after thirty four years of service. Applying the Reynolds' pension formula, note 8, *supra*, to the assumed facts, the equation is:
$$((0.020)(\$20,000) + (0.0075)(\$21,233.46)) \times 34 = \$19,014.53.$$

The Court is puzzled by the Affidavit of Irene Mahoney, the manager of Reynolds' Pensions, Life and Savings Plans. Exhibit A annexed to Defendant's Memorandum of Law, filed March 7, 1988. In her Affidavit, Ms. Mahoney swears that plaintiff, had he remained at Reynolds at the same salary until normal retirement at age sixty-five, would have been entitled to an annual pension of $18,293.04. Because Ms. Mahoney provides no explanation as to the derivation of her figure, the Court will use its own calculation. Moreover, the numbers obtained by the Court and those provided by Ms. Mahoney are relatively close, varying only by about $720 per year. In light of this close approximation, there is small chance for error in the Court selecting its own calculation over Ms. Mahoney's figure.

lation. The Court cannot, of course, reach any specific figure with absolute certainty, but on balance, the level of uncertainty defendant is exposed to here is reasonable. Because salary is only one component of the pension calculation, a determination of lost pension benefits is less sensitive to future salary fluctuations than is a calculation of the lost salary itself. Accordingly, the Court concludes that plaintiff should be compensated under the ADEA for his lost pension benefits.

According to life insurance tables,[10] plaintiff's life expectancy at the time of his discharge was 80 years. His loss in pension benefits, then amounts to an income stream of $5134.73 lasting for fifteen years beginning at his expected retirement in the year 1993. A fifteen year income stream of $5134.73, discounted at a 2% annual rate,[11] has a present value of $65,977.50.[12] This figure, however, must be further discounted since it is not to begin until 1993, five years hence. The present value of $65,977.50 to be paid in five years, again using a 2% discount rate, is $59,757.87. Accordingly, defendant must pay to plaintiff $59,757.87 to compensate plaintiff for lost pension benefits.

### 3. *Insurance Benefits*

 Plaintiff further seeks $28,213 to compensate him for insurance benefits he has lost as a result of his dismissal.

Plaintiff's Contentions ¶¶ 23, 26, 27. He claims that life insurance, dental insurance, and vision insurance benefits, which he received as an employee of Reynolds, are not offered by Conklin. Compensation for lost insurance benefits is appropriate under the ADEA. The measure of damages is the amount paid by the employer in premiums. *Fariss v. Lynchburg Foundry,* 769 F.2d 958, 965 (4th Cir.1985). In addition, where the discharged employee has elected to obtain substitute insurance, the ADEA permits full recovery of any additional premiums for the comparable individual policy beyond what the employer would have paid for group insurance. *Id.* at 966 (followed in *Bonura v. Chase Manhattan Bank, N.A., supra,* 629 F.Supp. at 359–61).

Reynolds provided plaintiff with life insurance coverage in an amount equal to twice his annual salary. Conklin does not provide that benefit. The cost to Reynolds of maintaining that level of insurance coverage for plaintiff is estimated to be $23,000 for the period from 1989 until 1993.[13] In addition, plaintiff has paid or will pay $543.96 to obtain individual coverage from March of 1987 through February of 1989.[14] The jury verdict of December 1986 compensated plaintiff fully for damages up to that date. *See Koyen v. Consolidated Edison Co., supra,* 560 F.Supp. at 1169 (front-pay salary award calculated from date of jury's verdict until anticipated retirement). The

**10.** Selected Life Table Values, Item No. 161, Supp. 266, Amer.Jur.Desk Book, (1979 & Supp. 1987).

**11.** *Doca v. Marina Mercante Nicaraguense, S.A.* 634 F.2d 30, 39 (2nd Cir.1980) ("A 2% discount rate appears to be the estimate of true cost of money appropriate for use in a computation whose purpose is to determine the present value of lost future wages."), *cert. denied,* 451 U.S. 971, 101 S.Ct. 2049, 68 L.Ed.2d 351 (1981). *See also Oliveri v. Delta Steamship Lines, Inc.,* 849 F.2d 742, 745–48 (2d Cir.1988) (absent contrary evidence by the parties, district court should apply 2% discount rate to a damage award compensating for future lost earnings).

**12.** All discounted values are calculated using tables that appear in D. Thorndike, Thorndike Encyclopedia of Banking and Financial Tables, p. 8–479 (1980).

**13.** The payments are broken down as follows: $3000 for 1989; $3500 for 1990; $5500 for 1991;

$5500 for 1992; and $5500 for 1993. Affidavit of James J. Buckley, filed March 7, 1988 ¶ 21. The Court recognizes that since employee life insurance coverage at Reynolds was set at twice the individual employee's annual salary and plaintiff has assumed salary increases had he remained at Reynolds which the Court has rejected, these estimates of premium costs may not be totally accurate. They are, however, the best figures that have been submitted to the Court and are uncontradicted by defendant. The Court therefore accepts these figures as within the permissible range of uncertainty permitted under the ADEA for the calculation of future damages.

**14.** From March 1987 through February 1988 plaintiff paid $25.01 monthly to obtain $50,000 coverage. Since March 1988 plaintiff has been paying $20.32 monthly to obtain $40,000 coverage. Buckley Aff. ¶ 22.

present value of these payments amounts to $22,115.68.[15] Accordingly, plaintiff is awarded that amount to compensate him for lost life insurance benefits.

■ Plaintiff also seeks to recover the value of dental and vision insurance benefits that he enjoyed as a Reynolds employee. An ADEA claimant, however, is entitled to recover the value of insurance premiums paid, not the value of benefits received. *Fariss v. Lynchburg Foundry, supra,* 769 F.2d at 965. Accordingly, the Court rejects plaintiff's application for compensation for the loss of these benefits.

### 4. *Savings Plan*

■ Reynolds employees have the opportunity to participate in an employee savings plan, whereby Reynolds contributes one half of the amount contributed by the individual employee, up to a maximum employee contribution each year of 6% of his or her annual salary. While employed at Reynolds, plaintiff made the maximum contributions to his savings plan, and received each year a contribution from Reynolds equalling 3% of his annual salary. Undisputed Facts ¶ 32. This a compensable fringe benefit under the ADEA. *Blim v. Western Elec. Co.,* 731 F.2d 1473, 1480 (10th Cir.) (citing H.R.Rep. No. 950, 95th Cong., 2d Sess. 13, *reprinted in* 1978 U.S. Code Cong. & Admin.News 504, 528, 535), *cert. denied,* 469 U.S. 874, 105 S.Ct. 233, 83 L.Ed.2d 161 (1984). Furthermore, assuming that plaintiff had maintained his 1983 salary level, and in light of plaintiff's long history of maintaining maximum contributions to his plan, an award to plaintiff compensating him for these lost employer contributions does not expose defendant to unduly speculative liability. Three percent of plaintiff's 1983 salary amounts to $1237. The jury's verdict in this case compensated plaintiff fully for the period through 1986. Plaintiff, then, is entitled to compensation for the loss of a $1237 annual income stream from 1987 until his anticipated retirement in 1993. The present value of these payments is $8391.14.[16]

### 5. *Vacation Time*

■ Finally, plaintiff seeks compensation for the loss of three weeks each year of paid vacation. At Reynolds, plaintiff was entitled to five weeks each year of paid vacation, while at Conklin, plaintiff now receives only two weeks each year. Undisputed Facts ¶¶ 24, 25. These uncontroverted facts establish a "real loss of vacation time" as a result of plaintiff's wrongful termination, which was required by this Court in *Bonura* as a condition for the award of compensation for lost vacation time. *Bonura v. Chase Manhattan Bank, N.A., supra,* 629 F.Supp. at 358–59. At plaintiff's 1983 Reynolds salary, three weeks of vacation time would be worth $2378.85.[17] The current value of annual payments of this amount, from 1987 until 1993, is $16,136.84.

### CONCLUSION

Having determined that plaintiff has satisfied the three criteria set forth in *Whittlesey* for an award of front pay pursuant to the ADEA, the Court holds that plaintiff is entitled to compensation for the loss of pension benefits, life insurance, employer contributions to his savings plan and for

---

**15.** Future payments are discounted at an annual rate of 2%, as described above at notes 11 & 12, *supra,* and accompanying text. The Court awards prejudgment interest at an annual rate of 7% when to compensate plaintiff for payments made in 1987. The apparent inconsistency between the two rates is understood when one considers the purposes of the adjustments. The cost of money includes two components: the true time value of money and inflation. If projected future payments are not adjusted upward to account for anticipated inflation, then it is inappropriate to account for anticipated inflation in setting the discount rate. Prejudgment interest, however, must include both compo-

nents in order to make plaintiff whole. *See Oliveri v. Delta Steamship Lines, Inc., supra,* 849 F.2d at 746; *Doca v. Marina Mercante Nicaraguense, S.A., supra,* 634 F.2d at 39–40 & n. 10.

**16.** The present value of these payments is calculated in the same manner used above in calculating the present value of life insurance premium payments.

**17.** This figure is derived by multiplying plaintiff's 1983 salary by $3/52$, to determine the amount of three weeks' salary.

lost vacation time. Plaintiff may not recover for lost salary or for vision or dental insurance benefits. The Court awards plaintiff damages in the amount of $106,-401.53, together with postjudgment interest at the rate of 7% per annum, calculated from the date of this Opinion. Plaintiff may submit an application for fees following the entry of judgment in this action.

Settle judgment on notice.