Irma RIVERA, Plaintiff,

v.

BACCARAT, INC., Defendant.

No. 95 Civ. 9478(MBM)(JCF).

United States District Court,
S.D. New York.

Jan. 8, 1999.

Joseph C. Maya, Maya & Associates, P.C., Westport, CT, for plaintiff.

Jeffrey H. Daichman, Judith A. Stoll, Kane Kessler, PC, New York City, for defendant.

## MEMORANDUM AND ORDER

FRANCIS, United States Magistrate Judge.

The plaintiff in this case, Irma Rivera, sued her former employer, Baccarat, Inc. ("Baccarat"), alleging that it had terminated her from her job as a salesperson on the basis of her age and national origin. After trial, a jury rejected Ms. Rivera's age discrimination claim but awarded her compensatory and punitive damages on the ground that she had been discharged because she is Hispanic in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.* In a previous opinion, *Rivera v. Baccarat, Inc.,* 10 F.Supp.2d 318 (S.D.N.Y.1998), I denied Baccarat's motion for judgment as a matter of law or for a new trial, but I reduced the damage award to the statutory maximum of $50,000 as required by 42 U.S.C. § 1981a.

The plaintiff now moves for an award of back pay and related benefits as well as front pay, issues that the parties had agreed would be reserved for decision by the Court. I suggested that the parties conduct an evidentiary hearing on these matters, but they demurred, preferring to submit a set of stipulated facts and to rely on the trial transcript.

*Background*

Ms. Rivera was terminated by Baccarat on July 29, 1995. (Stipulation dated Nov. 30, 1998 ("Stip.") ¶ 1(a)). She then went on a previously planned vacation before beginning to search for new employment during the first week of September 1995. (Tr. 372–73; Stip. ¶ 1(b)).[1] On October 10, 1995, she was hired as a salesperson by Bernardaud, which, like Baccarat, sells fine tableware. (Stip.¶ 1(c)).

Ms. Rivera was terminated by Bernardaud on July 15, 1996. (Stip.¶ 1(c)). She then resumed her job search and was hired in the bridal registry department at Bloomingdale's on December 10, 1996. (Stip.¶ 1(d)).

The plaintiff now seeks compensation for lost wages, vacation pay, and sick pay; for the costs she incurred in continuing her health insurance coverage; and for the employer's contribution to a 401(k) retirement program. She also seeks an award of front pay and future benefits.

*Discussion*

### A. Back Wages

■ It is the "purpose of Title VII to make persons whole for injuries suffered on account of unlawful employment discrimination." *Albemarle Paper Co. v. Moody,* 422 U.S. 405, 418, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975). Accordingly, while an award of back pay is not automatic, it "should be denied only for reasons which, if applied generally, would not frustrate the central statutory purposes of eradicating discrimination throughout the economy and making persons whole for injuries suffered through past discrimination." *Id.* at 421, 95 S.Ct. 2362 (footnote omitted). Here, Baccarat does not dispute that some award of back pay is appropriate. However, the parties disagree over the period for which back pay should be granted and the method of calculation.

Baccarat contends that Ms. Rivera is entitled to back pay only for the period during which she was seeking work and before she was hired by Bernardaud. The defendant argues that compensation should not be allowed for any subsequent period both be-

cause Ms. Rivera was terminated by Bernardaud for inadequate performance and because she failed thereafter to seek substantially equivalent employment, opting instead to take a lower paying job at Bloomingdale' s. (Letter of Judith A. Stoll dated Aug. 6, 1998 ("Stoll Letter"), at 2).

At trial, the plaintiff first testified to the job search she made after her termination from Baccarat. She solicited leads from her former colleagues at Baccarat, reviewed classified ads, and made telephone calls to department stores, boutiques, and offices. (Tr. 287–89, 373). She did not restrict her search to Manhattan, but also looked for opportunities in the Bronx, Queens, and New Jersey. (Tr. 287). Among the stores she contacted were Bergdorf Goodman, Lord & Taylor, Bloomingdale's, Lalique, and Kristave. (Tr. 288). After about five weeks of seeking work, Ms. Rivera was hired by Bernardaud, where her job responsibilities were similar to those at Baccarat and her compensation was roughly comparable. (Tr. 374–75; Stip. ¶¶ 2, 3, 6, 8–9).

According to Ms. Rivera, she was discharged from Bernardaud when the outlet in which she was working closed. (Tr. 291–93, 377–78). She then began a new job search which involved the same types of efforts she had made after her termination from Baccarat. (Tr. 294). Ms. Rivera received no response to her inquiries until she was hired by Bloomingdale's in the bridal registry department. (Tr. 294–95). There, her duties are more limited than they had been at Baccarat or Bernardaud, and her compensation and benefits are significantly diminished. (Tr. 295–96; Stip. ¶¶ 2–4, 6–10).

■ A victim of employment discrimination must mitigate her damages by using reasonable diligence to find suitable employment. *Greenway v. Buffalo Hilton Hotel,* 143 F.3d 47, 53 (2d Cir.1998); *Dailey v. Societe Generale,* 108 F.3d 451, 455 (2d Cir. 1997). However, "the employer has the burden to demonstrate that suitable work existed in the marketplace and that its former employee made no reasonable effort to find

---

1. "Tr." refers to the trial transcript.

it." *Greenway,* 143 F.3d at 53 (citing *Dailey,* 108 F.3d at 456).

■ Here, Baccarat has not met its burden. It is true that in order to fulfill the duty to mitigate, a plaintiff must maintain a suitable job once one has been located. *See E.E.O.C. v. Delight Wholesale Co.,* 973 F.2d 664, 670 (8th Cir.1992); *Brady v. Thurston Motor Lines, Inc.,* 753 F.2d 1269, 1277 (4th Cir.1985). But Baccarat has failed to show that Ms. Rivera lost her position at Bernardaud through any fault of her own. While the defendant claims to "have reason to believe" that Ms. Rivera was fired for poor performance (Stoll Letter at 2), it has offered no evidence in support of this allegation. By contrast, Ms. Rivera's unrebutted testimony shows that Bernardaud laid her off because it closed the store where she worked.

Nevertheless, the plaintiff's entitlement to back pay would also be terminated if she failed to make a diligent job search after leaving Bernardaud. Baccarat contends that because she found comparable employment at Bernardaud within five weeks of beginning her first job search, she should also have been able the second time around to locate a position more comparable than the job she accepted at Bloomingdale's. (Stoll Letter at 2). This argument is unpersuasive. While Ms. Rivera's testimony about her second job search was brief, she did indicate that she made the same efforts as she had after Baccarat discharged her. The defendant could have tested this statement on cross-examination but did not do so. Furthermore, Baccarat made no effort to demonstrate that comparable employment was available; the fact that the plaintiff was able to secure a job quickly with Bernardaud may have been purely serendipitous. Indeed, this inference is supported by the fact that Ms. Rivera sought employment for almost five months before accepting a lower paying job at Bloomingdale's. Accordingly, the plaintiff is entitled to back pay from the date of her termination to the date of judgment, reduced by the amount of her earnings during this period.

■■ At Baccarat, Ms. Rivera received a base salary plus commissions. Her salary for 1994, the last full year of her employment there, was $32,390.[2] Because commissions are an integral part of an employee's compensation, they must be included in a back pay calculation if they can be predicated with reasonable certainty. *See Goldstein v. Manhattan Industries, Inc.,* 758 F.2d 1435, 1446–47 (11th Cir.1985); *Loubrido v. Hull Dobbs Co.,* 526 F.Supp. 1055, 1060 (D.P.R.1981). Here, the plaintiff's commissions fluctuated from year to year, and it is therefore appropriate, as the defendant suggests, to use as a base the average commission received for the years 1990–1994. This is $14,728. (Stip. ¶ 2 & n. 1). Thus, salary plus commissions for the base year 1994 is deemed to be $47,118. The parties agree that the compensation that Ms. Rivera would have earned at Baccarat thereafter should be calculated by applying a 3% annual increase to this figure. (Stip. ¶ 2 & n. 1). Therefore, the plaintiff's projected earnings at Baccarat would have been:

| Year | Compensation | |
|------|------------|---|
| 1994 | $47,118 | ($906/week) |
| 1995 | $48,532 | ($933/week) |
| 1996 | $49,988 | ($961/week) |
| 1997 | $51,488 | ($990/week) |
| 1998 | $53,033 | ($1,020/week) |

■ From this amount of base compensation, it is necessary to subtract the amount that Ms. Rivera actually earned for each relevant period. She is not entitled to any damages until she first began her job search in the first week of September 1995. She was then unemployed for a period of five weeks until she was hired by Bernardaud on October 10, 1995. (Stip.¶ 1(b) –(c)). Multiplying her projected 1995 weekly salary of $933 times five weeks yields a damage figure of $4,665 for this period.

For the balance of 1995, Ms. Rivera is entitled to the difference between her projected compensation at Baccarat and her actual wages at Bernardaud. The $7,555 she received from Bernardaud for this twelve week period (Stip.¶ 3) works out to $630 per week, or $303 less than she would have earned at Baccarat. The difference for the entire period, then, is twelve times $303, or $3,636.

**2.** All figures will be rounded to the nearest dollar.

Next comes the difference for the period from January 1, 1996 to July 15, 1996 when the plaintiff was terminated by Bernardaud. (Stip.¶ 1(c)).[3] For this twenty-eight week period, Ms. Rivera received $24,529 (Stip.¶ 3), which is $876 per week, or $85 less than the $961 per week she would have made at Baccarat. For twenty-eight weeks, this comes to $2,380 in damages.

From her termination by Bernardaud until she was hired by Bloomingdale's on December 10, 1996, Ms. Rivera was unemployed for twenty-one weeks. (Stip.¶ 1). Since she would have earned $961 per week from Baccarat during this period, her corresponding damages are $20,181.

Throughout all of 1997, Ms. Rivera worked at Bloomingdale's and made a total of $22,329.[4] (Stip.¶ 4). Since she would have made $51,488 at Baccarat over that year, she is entitled to $29,159 in damages.

Finally, Ms. Rivera has received $17,881 from Bloomingdale's over the forty-two weeks from January 1, through October 15, 1998. (Stip.¶ 4). This works out to $426 per week, as compared to $1,020 per week as projected for Baccarat. The difference of $594 times forty-two weeks results in $24,948 in damages.

The plaintiff's total back pay award, then, is $84,969, calculated as follows:

| Period | Projected Baccarat Earnings | – | Actual Earnings | = | Difference | × | No. of Weeks | = | Damages |
|---|---|---|---|---|---|---|---|---|---|
| Sept. 05, 1995– Oct. 10, 1995 | $933/wk | – | 0 | = | $933/wk | × | 5 | = | $4,665 |
| Oct. 10, 1995– Dec. 31, 1995 | $933/wk | – | $630/wk | = | $303/wk | × | 12 | ≐ | $3,636 |
| Jan. 01, 1996– July 15, 1996 | $961/wk | – | $876/wk | = | $85/wk | × | 28 | = | $2,380 |
| July 15, 1996– Dec. 10, 1996 | $961/wk | – | 0 | = | $96 1/wk | × | 21 | = | $20,181 |
| Jan. 01, 1997– Dec. 31, 1997 | $51,488 | – | $22,329 | | | | | = | $29,159 |
| Jan. 01, 1998– Oct. 15, 1998 | $1,020/wk | – | $426/wk | = | $594/wk | × | 42 | = | $24,948 |
|  |  |  |  |  |  |  |  | Total: | $84,969 |

### B. *Fringe Benefits*

■ In order to be made whole, a wrongfully terminated employee is entitled not only to back pay, but also to compensation for lost fringe benefits. *See United States v. Burke*, 504 U.S. 229, 239, 112 S.Ct. 1867, 119 L.Ed.2d 34 (1992). Here, Ms. Rivera seeks damages for the cost of continuing her insurance coverage, for the value of vacation and sick days, and for employer contributions that Baccarat would have made to a 401(k) plan.

### 1. *COBRA Benefits*

■ The plaintiff is entitled to compensation for the costs she incurred in maintaining health insurance coverage equivalent to that she received through Baccarat. *See Gaworski v. ITT Commercial Finance Corp.*, 17 F.3d 1104, 1111 (8th Cir.1994). In this case, Ms. Rivera paid a total of $2,921 in order to extend her coverage as provided for in the Consolidated Omnibus Budget Reconciliation Act ("COBRA"), 29 U.S.C. § 1161 *et seq.*

---

3. The stipulation refers to a termination date of July 15, 1995. This is clearly a typographical error, since the plaintiff did not begin to work at Bernardaud until October 1995, and she testified at trial that she was laid off in July 1996. (Tr. 377–78).

4. Although she worked at Bloomingdale's for the last three weeks of 1996, the plaintiff has proffered no evidence of her earnings there and is therefore entitled to no damages for that period.

(Stip.¶ 5). She is therefore entitled to a damage award in that amount.

■ In one submission, Ms. Rivera's counsel included a number of checks representing payments made by the plaintiff apparently in connection with health services, and suggested that reimbursement would be sought from the Court. (Letter of Joseph C. Maya dated Aug. 28, 1998). However, Ms. Rivera has offered no proof that these were costs that would have been covered under Baccarat's program but were not included in the extended coverage. Accordingly, her damages shall be limited to the stipulated amount of the COBRA payments.

### 2. *Vacation and Sick Pay*

■ Like health coverage, vacation and sick time constitute benefits that should be included in a damage calculation under Title VII. *See Buckley v. Reynolds Metals Co.,* 690 F.Supp. 211, 220 (S.D.N.Y.1988). This can be done here by taking the difference between the number of vacation and sick days to which Ms. Rivera would have been entitled at Baccarat and the number she received in her subsequent jobs and multiplying by the agreed upon value of each day of leave.

When Ms. Rivera was discharged by Baccarat in 1995, she had two sick days and seven vacation days remaining for which she was not paid. (Stip.¶ 8). Each leave day was worth $119.23 during that year. (Stip. ¶ 11). Accordingly, the plaintiff's damages for lost vacation and sick leave for 1995 are $1,073. In 1996, Ms. Rivera would have been entitled to eight sick days and fifteen vacation days at Baccarat, but received only two sick days and five vacation days at Bernardaud. (Stip.¶¶ 8, 9). Thus, she is entitled to compensation for the difference of sixteen leave days at $122.81 each for a total of $1,965. (Stip.¶ 11). For 1997, the plaintiff would again have qualified for eight sick days and fifteen vacation days at Baccarat. (Stip. ¶ 8). At Bloomingdale's she received two days of sick pay at one-third pay and three

vacation days. (Stip.¶ 10(a)–(b)). Thus, the difference is seven and one-third sick days plus twelve vacation days, for a total of nineteen and one-third days. At a rate of $126.49 per day (Stip.¶ 11), Ms. Rivera's damages for this period are $2,445. Finally, in 1998, the plaintiff would have received eight sick days and twenty vacation days at Baccarat. (Stip. ¶ 8). Instead, she was entitled to three sick days at one-third pay (or, the equivalent of one day at full pay) and five vacation days at Bloomingdale's. (Stip.¶ 10). She thus received twenty-two fewer days of leave valued at $130.29 each (Stip.¶ 11), for damages of $2,866. The total damages award for loss of sick and vacation leave is therefore $8,349.

### 3. *401(k) Plan*

■ When, as in a 401(k) plan, the employer makes a contribution based on how much the employee contributes, the employer's share may be an element of damages if it can be predicted with reasonable certainty. *See Gaworski,* 17 F.3d at 1111; *Buckley,* 690 F.Supp. at 220; *cf. Inks v. Healthcare Distributors of Indiana, Inc.,* 901 F.Supp. 1403, 1412 (N.D.Ind.1995) (award for 401(k) benefits denied where employer adopted plan after plaintiff's termination and plaintiff therefore had no record of contributions). In this case, the plaintiff contributed to her 401(k) plan at Baccarat in amounts that triggered employer contributions averaging $3,486 over her last two full years of employment there. (Stip.¶ 6). The plaintiff alleges that she did not qualify for participation in a 401(k) plan at Bernardaud, and Baccarat has offered no evidence to the contrary. (Stip. ¶ 6 n. 2). It is agreed that she became eligible to participate in Bloomingdale's plan on January 1, 1998. (Stip.¶ 7). Therefore, Ms. Rivera is entitled to the value of the employer contributions that Baccarat would have made to her 401(k) plan for the four-week period in 1995 after she began looking for work and for all of 1996 and 1997. Two and one-third years multiplied by the average annual con-

tribution of $3,486 yields a total damage figure of $8,134.

## C. *Front Pay and Future Benefits*

■ In cases where reinstatement is inappropriate and the plaintiff has no reasonable prospect of finding comparable employment, the court may award front pay and future benefits. *Reed v. A.W. Lawrence & Co.*, 95 F.3d 1170, 1182 (2d Cir.1996). This represents compensation for future losses that the plaintiff would not suffer but for the discriminatory acts of the defendant.

■ In this case, Baccarat argues that no such award may be granted because front pay is included within the statutory cap on damages as established by the Civil Rights Act of 1991, and that cap has already been met by the jury's award of compensatory and punitive damages. The defendant relies on 42 U.S.C. § 1981a(b)(3), which provides in pertinent part:

> The sum of the amount of compensatory damages awarded under this section for future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses, and the amount of punitive damages awarded under this section, shall not exceed ... [the statutory cap].

Baccarat contends that the term "future pecuniary losses" includes any award of front pay.

This is an issue that has sharply divided the courts and has not yet been addressed by the Second Circuit. Those courts that find front pay to be within the cap generally rely on the plain language of the statute. *See Hudson v. Reno*, 130 F.3d 1193, 1202–04 (6th Cir.1997); *Kim v. Dial Service International, Inc.*, No. 96 Civ. 3327 (DLC), 1997 WL 458783, at *15 (S.D.N.Y. Aug.11, 1997), *aff'd on other grounds*, 159 F.3d 1347 (2d Cir. 1998) (table); *Passantino v. Johnson & Johnson Consumer Products, Inc.*, 982 F.Supp. 786, 788 (W.D.Wash.1997); *Hamlin v. Charter Township of Flint*, 965 F.Supp. 984, 987 (E.D.Mich.1997); *McCue v. State of Kansas, Department of Human Resources*, 948 F.Supp. 965, 967 (D.Kan.1996). In *Hudson*, 130 F.3d at 1203, for example, the court refers to Webster's Dictionary to ascertain the meaning of "future," "pecuniary," and "losses," and concludes that front pay comes within the conjunction of these terms.

This analysis, however, ignores the language of 42 U.S.C. § 1981a(b)(2), which provides that "[c]ompensatory damages awarded under this section shall not include backpay, interest on backpay, *or any other type of relief authorized under section 760(g) of the Civil Rights Act of 1964* [42 U.S.C. § 2000e–5(g) ]" (emphasis added). Courts holding that the statutory cap does not include front pay recognize that front pay has long been an equitable remedy that may be awarded in the court's discretion under Title VII. *See Bizelli v. Amchem*, 17 F.Supp.2d 949, 954 n. 2 (E.D.Mo.1998); *Baty v. Willamette Industries, Inc.*, 985 F.Supp. 987, 999–1000 (D.Kan. 1997); *Colwell v. Suffolk County Police Department*, 967 F.Supp. 1419, 1432 n. 9 (E.D.N.Y.1997); *Benson v. Northwest Airlines, Inc.*, No. 4–95–581 DSDJGL, 1997 WL 122897 at *2 (D.Minn. March 18, 1997).

■ Thus, when Congress authorized compensatory and punitive damages in the Civil Rights Act of 1991, it created a cap on those new remedies alone, not on preexisting forms of relief. This reasoning is supported by the legislative history. For example, in announcing the compromise that was ultimately enacted, Senator Kennedy stated that under what would become 42 U.S.C. § 1981a, "[c]ompensatory damages do not include backpay, interest on backpay, or any other type of relief authorized under section 706(g) of the Civil Rights Act of 1964, *including front pay.*" 137 Cong.Rec. S15234 (daily ed. Oct. 25, 1991) (statement of Sen. Kennedy) (emphasis added). Likewise, when Representative Edwards presented the bill to the House after it had been passed by the Senate, he stated that "[d]amages awarded under [§ 1981] cannot include remedies already available under Title VII including backpay, the interest thereon, *front pay*, and any oth-

er relief authorized under Title VII." 137 Cong.Rec. H9527 (daily ed. Nov. 7, 1991) (statement of Rep. Edwards) (emphasis added). Because the language creating the statutory cap must be read together with the definition of compensatory damages in section 1981a(b)(2), the term "future pecuniary losses" is open to interpretation, and the legislative history provides convincing evidence that it does not include front pay.

Nevertheless, the court in *Hudson,* 130 F.3d at 1204, reasoned that unless the phrase "future pecuniary losses" includes front pay, it is meaningless because there is no other type of loss that it could refer to. That, however, is not the case. A victim of discrimination who will suffer mental anguish in the future is now entitled to compensatory damages for this nonpecuniary loss. Any such award comes within the statutory cap. In addition, if that person will need psychological counseling as a result of the anguish, the costs of such care will be compensable as future pecuniary losses, also subject to the cap. Front pay, then, does not come within the statutory cap, and Ms. Rivera's application cannot be denied on that basis.

■■■■■■ The award of front pay is within the sound discretion of the court. *Reed,* 95 F.3d at 1182; *Sharkey v. Lasmo (Aul Ltd.),* 15 F.Supp.2d 401, 404 (S.D.N.Y.1998); *Rao v. New York City Health & Hospitals Corp.,* 882 F.Supp. 321, 331 (S.D.N.Y.1995). Where a plaintiff has already been fully compensated for the injuries resulting from discrimination, front pay is not appropriate. *Id.* at 332. In order to qualify for front pay, a plaintiff must have been diligent in seeking comparable employment, *Reed,* 95 F.3d at 1182, and under no circumstances can the award be based on undue speculation. *Sharkey,* 15 F.Supp.2d at 404.

■■■ In this case, Ms. Rivera testified in detail about her job search in the fall of 1995 prior to being hired by Bernardaud. Her testimony about the subsequent search to her job at Bloomingdale's was more summary, but it was sufficient to demonstrate that she had taken reasonable steps to mitigate her damages at that time. However, the plaintiff has now worked at Bloomingdale's for two years for significantly lower wages and benefits than she received at Baccarat, yet she has presented no evidence that she has made any further efforts to secure more comparable employment. It would therefore be inequitable to grant her additional damages in the form of front pay and future benefits.

■■■ Pursuant to the jury's verdict and today's decision, Baccarat will be liable for more than three years' worth of back pay and benefits together with $50,000 in compensatory and punitive damages. This fully compensates Ms. Rivera for any injury attributable to Baccarat's discrimination and satisfies the goals of Title VII. To award front pay under these circumstances would make Baccarat responsible for maintaining Ms. Rivera's income level into the future without regard to any continuing efforts she may or may not have made to mitigate those damages. Without evidence of any current attempts to find comparable work, an award of front pay would be speculative. *See Greenbaum v. Svenska Handelsbanken, NY,* 979 F.Supp. 973, 988 (S.D.N.Y.1997) (declining to award front pay in light of uncertainty about market at issue).

Thus, while front pay is not precluded by the statutory cap on damages, such an award is not appropriate in this case in light of the plaintiff's failure to present evidence that she continues to make reasonable efforts to secure comparable employment.

*Conclusion*

For the reasons set forth above, the plaintiff is entitled to damages as follows:

| | |
|---|---|
| Back Pay | $ 84,969 |
| COBRA Payments | 2,921 |
| Vacation & Sick Pay | 8,349 |
| 401(k) Plan | 8,134 |
| Front Pay | 0 |
| Total: | $104,373 |

Counsel shall submit a proposed judgment on notice within ten days of the date of this Memorandum and Order.

SO ORDERED.