Jack EPTER, Plaintiff,

v.

**NEW YORK CITY TRANSIT AUTHORITY, Defendant.**

Civil Action No.99–CV–3050(DGT).

United States District Court, E.D. New York.

Jan. 31, 2001.

Robert Walter Ottinger, Jr., Jersey City, NJ, for plaintiff.

Joyce Rachel Ellman, New York City Transit Authority, Brooklyn, NY, for defendant.

## MEMORANDUM AND ORDER

TRAGER, District Judge.

Plaintiff Jack Epter sued the New York City Transit Authority ("TA") for a violation of the ADEA after the TA failed to promote him to the rank of Station Supervisor, Level I on the heels of his refusal to submit to an EKG test that the TA administered to those applicants for the position exhibiting risk factors and all applicants for the position over the age of forty. Both Epter and the TA now move for summary judgment solely on the issue of liability,

contending that there is no dispute as to any material fact that stands in the way of a disposition in this case.

## Background

The facts in this case are rather straightforward and are indeed, by and large, undisputed.

Epter was originally appointed to his position as a Railroad Clerk on September 8, 1980. *See* Def.'s Rule 56.1 Statement ¶ 1 [hereinafter "Def.'s Facts"]. In May of 1992, Epter took a civil service examination to become a Station Supervisor, and his number on the Civil Service list was reached in November of 1994. *See id.* ¶¶ 2–3.

The TA required all candidates seeking promotion to the Station Supervisor, Level I position to submit to and pass a physical examination, and Epter's examination was administered on December 2, 1994 by Dr. Cassandra Clarke Belgrave. *See id.* ¶¶ 4, 6–7. Epter submitted to a urine screening, a blood pressure test, a vision test and a hearing test, but for reasons not elucidated by the record in this case, he refused to undergo an electrocardiogram ("EKG"), which the TA administered to Station Supervisor candidates under forty with a problematic medical history and to all Station Supervisor candidates over forty. *See id.* ¶ 8–9. Epter was forty-six years old at the time of the physical examination, *see* Pl.'s Statement of Undisputed Material Facts Pursuant to Local Rule 56.1 Supp. Pl.'s

Mot. Sum. J. ¶ 8, and so fell into the latter category of candidates.

Dr. Belgrave explained to Epter that the reason for the EKG had to do with the supervisor's duties in supervising an ambulatory wash team, which was physically more strenuous than the duties Epter had to perform in his then-current position of Railroad Clerk, which was a largely sedentary position.[1] *See* Def.'s Facts ¶ 10. Despite this explanation, Epter refused to allow Dr. Belgrave to conduct the EKG.

As a result of Epter's refusal, he was not promoted to the Station Supervisor, Level I position. *See id.* ¶ 14. Among those promoted were candidates both over and under the age of forty. *See id.* ¶ 15.

On June 1, 1998, the TA eliminated the medical examination requirement for promotion to supervisory positions, *see id.* ¶ 17, and on October 17 of that year, the TA promoted Epter to the probationary position of Station Supervisor, Level I. *See id.* ¶ 18. On November 20, 1998, however, Epter resigned from that position and requested to be, and was, returned to his old position, citing proximity to his home as his reason for preferring the old position. *See id.* ¶¶ 19, 22.

## Discussion

### (1)

■ The Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 et

---

1. Dr. Belgrave explained in her affidavit that the position of Station Supervisor, Level I would involve supervision of employees in the titles of Cleaner and Railroad Clerk, and supervisors may have to perform tasks similar to those of these employees as part of their responsibilities. *See* Def.'s Ex. C. The position of Cleaner is described in the following terms:

• Duties involve sweeping, scrubbing and/or washing subway and elevated stations, including steps, platforms, tiled walls, toilets as well as emptying trash cans and other refuse.
• Duties require moderate strength mainly of the trunk for carrying supplies or refuse.
• Duties are performed standing and walking including climbing stairs or ladders as well as walking on tracks.

• Duties may be performed alone (station cleaners) or in teams (gangs on the tracks). They involve shift work and contact with violent persons (passengers or the homeless).
• Some tasks are performed outdoors thus exposing the workers to a variety of hot or cold temperatures (snow shovelling [sic] ). Major exposures are to soaps and detergents as well as dust.
• Protective devices include rubber gloves and goggles.

Def.'s Ex. C. 4. Although the position of Railroad Clerk also exposes the worker to cold temperatures, dust and regular interaction with violent persons, the job is otherwise less strenuous. *See id.*

seq. (1990), generally prohibits an employer from discriminating against and among employees who are at least forty years old on the basis of age. The majority of age discrimination cases require the claimant to make out a prima facie case of discrimination under the *McDonnell–Douglas* burden-shifting framework, under which he must show that he (1) is a member of the relevant protected class, (2) is qualified for and/or satisfactorily performing his job, (3) was subjected to an adverse employment decision, and that (4) this adverse decision occurred under circumstances giving rise to an inference of discrimination. *See McDonnell–Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973); *Tarshis v. Riese Org.*, 211 F.3d 30, 35 (2000). In some cases, however, "[t]he employer may have relied upon a formal, facially discriminatory policy requiring adverse treatment of employees with that trait." *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 610, 113 S.Ct. 1701, 1706, 123 L.Ed.2d 338 (1993).

In such a case the *McDonnell–Douglas* framework is wholly inapplicable, for while the "central purpose of the *McDonnell–Douglas* framework ... is 'progressively to sharpen the inquiry into the elusive factual question of intentional discrimination,'" *see St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 533–534, 113 S.Ct. 2742, 2761, 125 L.Ed.2d 407 (1993) (quoting *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 258, n. 8, 101 S.Ct. 1089, 1094, n. 8, 67 L.Ed.2d 207. (1981)), here, the issue of whether or not intentional discrimination is present cannot be appropriately described as an elusive factual question. This is not a case where an older employee is fired or passed over for promotion, and a court is called upon to scour a complicated morass of facts for evidence that age may have motivated the decision. Rather, this case presents an explicit classification based on age and an employer who acknowledges treating employees over the age of forty differently from their younger counterparts. The Second Circuit has established that "[i]n cases ... where

there is direct evidence that the disparate treatment ... is age-dependent, the *McDonnell–Douglas* search for a motive is unnecessary and therefore inapplicable." *Johnson v. New York*, 49 F.3d 75, 79 (2d Cir.1995). For this reason, the TA's insistent claims that "[p]laintiff overlooks the fact that he has produced no evidence that the defendant intended to 'discriminate' against plaintiff because of his age," Def.'s Reply at 6, are beside the point. The policy itself is facial evidence of intentional discrimination. The real question is whether this type of intentional discrimination is prohibited by the ADEA. Specifically, the questions that remain to be answered in this case, are (1) whether this policy constitutes, on its face, intentional discrimination prohibited by the ADEA; and (2) if so, whether it is, nonetheless, justified as a bona fide occupational qualification.

### (2)

■ Only the First Circuit has squarely addressed the issue presented in this case. In *EEOC v. Massachusetts*, 987 F.2d 64 (1st Cir.1993), a state statute required government employees over the age of seventy to take and pass medical examinations as a condition of continued employment. *See id.* at 66. Upon turning seventy, employees seeking to retain their positions had to complete an application and submit to a medical examination. *See id.* The results of the examination would then go to the retirement board, which would vote to grant or deny the application. *See id.* Those whose applications were granted would have to reapply in a similar manner each subsequent year that they sought to maintain their employment. *See id.* Those whose applications were denied would be retired on the last day of the month of their birth. *See id.*

Massachusetts argued that the statute in question did not violate the ADEA because the fitness of employees rather than their age was the true basis for the statute. *See id.* at 67. But the court rejected this contention, relying on the Supreme Court's

decision in *EEOC v. Wyoming,* 460 U.S. 226, 103 S.Ct. 1054, 75 L.Ed.2d 18 (1983), where the Court struck down a mandatory retirement policy under which game wardens had to retire at age fifty-five and insisted that if the concern underlying the policy is a desire to ensure that game wardens are physically able to discharge their duties, the ADEA requires that this goal be achieved "in a more individualized and careful manner than would otherwise be the case." *Id.* at 239, 103 S.Ct. at 1062. Adopting similar reasoning, the First Circuit concluded that Massachusetts' statute is "not reconcilable with the plain purpose of [the ADEA]." *EEOC v. Massachusetts,* 460 U.S. at 70. The First Circuit wrote:

> Massachusetts is not being asked to abandon the public policy of determining the fitness of its employees, just as Wyoming was not being asked to abandon the public policy of determining the physical preparedness of its game wardens. Instead, pursuant to the ADEA, just as Wyoming could not arbitrarily pick 55 years of age as the point at which to measure the physical preparedness of its game wardens, Massachusetts may not arbitrarily set up seventy years of age as the point at which to determine the fitness of its employees.

*Id.*

In arriving at its decision, the First Circuit also found relevant authority in the Supreme Court's decision in *Los Angeles Dep't of Water & Power v. Manhart,* 435 U.S. 702, 98 S.Ct. 1370, 55 L.Ed.2d 657 (1978), a case where a policy of the Los Angeles Department of Water and Power required larger contributions from women than from men to the department's pension fund on the premise that women, as a group, tended to outlive men, a premise derived from both the department's own experience and a study of mortality tables. *See id.* at 704–04, 98 S.Ct. at 1373–74. The Court began by conceding the accuracy of the generalization about gender differences that the department had made:

> This case does not . . . involve a fictional difference between men and women. It involves a generalization that the parties accept as unquestionably true: [w]omen, as a class, do live longer than men. The Department treated its women employees differently from its men employees because the two classes are in fact different.

*Id.* at 707–708, 98 S.Ct. at 1375. But, the Court went on to observe that "[i]t is equally true . . . that all individuals in the respective classes do not share the characteristic that differentiates the average class representatives." *Id.* at 708, 98 S.Ct. at 1375. "The question, therefore, is whether the existence or nonexistence of 'discrimination' is to be determined by comparison of class characteristics or individual characteristics." *Id.*

To this question, the Court gave an unequivocal answer:

> Congress has decided that classifications based on sex, like those based on national origin or race, are unlawful. Actuarial studies could unquestionably identify differences in life expectancy based on race or national origin, as well as sex. But a statute that was designed to make race irrelevant in the employment market could not reasonably be construed to permit a take-home-pay differential based on a racial classification.

*Id.* at 709, 98 S.Ct. at 1376. "An employment practice that requires 2,000 individuals to contribute more money into a fund than 10,000 other employees simply because each of them is a woman, rather than a man, is in direct conflict with both the language and policy of the Act," the Court concluded. *Id.* at 711, 98 S.Ct. at 1377.

The issues presented by this case are largely indistinguishable from those in *Manhart.* Here, too, a policy is in place which makes an explicit distinction on the basis of a factor, viz. age, that has been specifically earmarked for scrutiny under a federal antidiscrimination act. And, as in *Manhart,* the defendants offer some evi-

dence that suggests that the generalization on which they base the classification at issue may be accurate, insofar as generalizations go. In other words, persons over the age of forty may indeed have an "increased incidence of coronary artery disease, hypertension and heart abnormalities" as the TA contends. Def.'s Ex. C, ¶ 9. Nevertheless, as in *Manhart*, the generalization in question does not hold true for every individual in the protected class. Some persons under forty are as likely as some persons over forty to be at risk for coronary abnormalities.[2] Consequently, the policy underlying the ADEA and expressed by the Supreme Court in *EEOC v. Wyoming* and by the First Circuit in *EEOC v. Massachusetts*, requires that the TA pursue its goals in some "more individualized and careful manner." *EEOC v. Wyoming*, 460 U.S. at 239, 103 S.Ct. at 1062. As the Supreme Court has written, "[t]he employer cannot rely on age as a proxy for an employee's remaining characteristics . . . but must focus on those factors directly." *Hazen Paper Co.*, 507 U.S. at 609, 113 S.Ct. at 1705.

### (3)

■ However, this is not the end of the analysis. As the Supreme Court goes on to say in *EEOC v. Wyoming*, the employer may maintain its age-salient policy if it can demonstrate that age is being used as a "bona fide occupational qualification" ("BFOQ"). *See EEOC v. Wyoming*, 460 U.S. at 240, 103 S.Ct. at 1062. In fashioning the ADEA, Congress, borrowing a concept and statutory language from Title VII, provided that an age classification is lawful "where age is a bona fide occupational qualification reasonably necessary to the normal operation of the particular business." 29 U.S.C. § 623(f)(1).

■ In *Western Air Lines, Inc. v. Criswell*, 472 U.S. 400, 105 S.Ct. 2743, 86 L.Ed.2d 321 (1985), the Supreme Court adopted the Fifth Circuit's *Usery v. Tamiami Trail Tours, Inc.*, 531 F.2d 224 (5th Cir.1976) two-factor BFOQ test, which makes the BFOQ exception to the ADEA an affirmative defense on which the defendant has the burden and requires the employer to show that there is either (1) a substantial basis for believing that all or nearly all employees above an age lack the qualifications required for the position in question; or (2) that reliance on an age classification is necessary because it is highly impractical for the employer to insure by individual testing that its employees will have the necessary qualifications for the job. *See Western Air Lines*, 472

---

**2.** However, if the TA were able to advance some evidence to show that an overwhelming statistical disparity in the incidence of coronary conditions among the two age groups exists, e.g. that a mere 1% of persons under forty suffers from a coronary condition, while 30% of persons over forty are afflicted, then this case might well be distinguishable from *Manhart*, which is not to say definitively that the result be any different. First of all, the age of forty would have to be significant in some way for the age classification to make sense. In other words, while it is undoubtedly true that the incidence of heart conditions among persons under the age of ten is infinitesimal compared to the incidence of heart conditions in those over the age of ten, the age of ten is not itself in any way statistically salient. Second, even if forty were a true turning point, if any such point exists, for coronary artery disease, and even if the statistical disparity were pronounced, the imposition of an age classification would probably still have to

pass muster as a Bona Fide Occupational Qualification, *see* discussion of the "BFOQ defense" *infra*, which would require the TA to show either that (1) all or nearly all employees over the age of forty are unqualified for the job because of their coronary conditions or that (2) it would be very impractical for the TA to employ individualized testing of all employees to discover which ones have coronary conditions that would disqualify them from consideration for the position. Since the TA would be unable to show the former, the brunt of the inquiry would probably involve a court's consideration of whether the statistical evidence presented is significant enough to overthrow the general presumption in favor of individualized testing that the ADEA erects. All of this, of course, would be assuming that the TA can actually refuse to promote employees who fail their EKGs, which has certainly not been demonstrated on this record.

U.S. at 422–423, 105 S.Ct. at 2756; *see also Kimel v. Florida Bd. of Regents,* 528 U.S. 62, 87, 120 S.Ct. 631, 648, 145 L.Ed.2d 522 (2000). The *Western Air Lines* Court also cautioned that "[t]he restrictive language of the statute and the consistent interpretation of the administrative agencies charged with enforcing the statute convince us that … the BFOQ exception 'was in fact meant to be an extremely narrow exception to the general prohibition' of age discrimination contained in the ADEA." *Western Air Lines,* 472 U.S. at 412, 105 S.Ct. at 2750–51 (citation omitted).

In this case, several reasons militate against the applicability of the BFOQ defense. First, the TA does not allege and adduces no evidence to support the proposition that some substantial basis exists for believing that all or nearly all employees above the age of forty lack the qualifications required for the Station Supervisor, Level I position or that all or nearly all employees over the age of forty have any significant likelihood of possessing a heart condition that in some way prevents them from discharging the duties of the Station Supervisor, Level I position, i.e. supervising a wash crew, etc. Nor is this a job where an employee's lack of physical preparedness could pose a danger to the general public. *Cf. infra EEOC v. City of East Providence.*

Second, there is no claim that using individual testing rather than an age classification would be highly impractical or costly in this case. For example, this is not a case where the medical test in question itself presents a risk to younger patients— which could constitute a possible justification for an age classification. No such justification is adduced here. Indeed, the practicality of individualized testing is evidenced by the fact that the TA employs such an approach for all employees under forty: each employee under forty undergoes the regular physical examination that Epter submitted to and only if that examination or a problematic medical history indicates a reason to think that an EKG might be appropriate is an EKG thereupon administered. But once employees turn forty, the EKG is employed across the board. Cost also does not appear to be a factor in the policy.

 The TA attempts to muddy the waters by suggesting that it is, in fact, employing individualized testing and claims that it is not asserting a BFOQ defense because such a defense would be inapplicable where testing is already conducted on an individualized basis. *See* Def.'s Reply at 5, n. 7. As authority in support of its position, the TA cites the Supreme Court's decision in *Kimel,* which, in relevant part, relies on another Supreme Court decision, *Massachusetts Bd. of Retirement v. Murgia,* 427 U.S. 307, 96 S.Ct. 2562, 49 L.Ed.2d 520 (1976), which, in turn, found that a provision forcing retirement of Massachusetts police officers after age fifty is constitutional, despite evidence that the police officer in question was physically able to discharge his duties. *See id.* at 311, 96 S.Ct. at 2565. In *Murgia,* the state administered biennial physical examinations to police officers under the age of forty and rigorous, annual physical examinations to officers over forty until mandatory retirement set in at age fifty. This entire scheme was implicitly upheld by the Court.[3]

However, what the TA fails to mention is that *Murgia* did not involve claims brought under the ADEA and was, instead, brought under the equal protection clause, which mandates mere rational basis scrutiny for age classifications. *See Murgia,* 427 U.S. at 312–13, 96 S.Ct. at 2566–67. Additionally, the state's program in *Murgia* involves police officers, who, as the Court writes, "protect persons and property and maintain law and order …, participate in controlling prison and civil disorders, respond to emergencies and natural disasters, patrol highways in marked cruisers, investigate crime, apprehend

---

3. Only the mandatory retirement provision was directly challenged in the case.

criminal suspects, and provide backup support for local law enforcement personnel," *see id.* at 310, 96 S.Ct. at 2565, all in all, a far cry from the functions of Station Supervisor, Level I. Such public policy considerations also dictated the result in *EEOC v. City of East Providence*, 798 F.2d 524 (1st Cir.1986), in which the First Circuit reviewed and upheld, under the ADEA, a municipal ordinance providing for mandatory retirement for police officers over the age of sixty. The court, applying the factors of the BFOQ exception, agreed with the lower court's conclusions that "all or substantially all officers over 60 are incapable of effectively performing up to physical standards which the City's experts considered necessary for regular police work," *id.* at 528, "physical strength and stamina and the ability to withstand stress are job qualifications reasonably necessary to the performance of the functions" of the job, *id.* at 530, and "mandatory retirement from regular duty at age 60 is reasonably necessary to the operation of the police department." *Id.* at 531.

But it should be noted, once again, that the TA insists that the BFOQ exception that salvaged the mandatory retirement policy in *EEOC v. City of East Providence* does not apply in this case at all because of the individualized nature of the testing here. *EEOC v. Massachusetts* refutes this proposition. Just as the employees there were not automatically forced out of their jobs at the age of seventy, but rather, were simply subjected to annual physicals, the employees seeking promotion here are not automatically denied but are merely forced to undergo an additional procedure that is not administered to those younger than forty. This procedure is no more "individualized" than was the procedure at issue in the First Circuit case. In much the

same way that it would be impermissible to require all men but only women with known medical conditions to take an EKG for the Station Supervisor, Level I position, it would make a mockery of the notion of individualized testing to take it to mean testing all those over a certain age and only some of those under it on the evidence presented by the TA here.[4] While medical testing all those above a certain age is, perhaps, a practice less noxious under the ADEA than firing outright or automatically refusing promotion to those over that age, a facial age classification is still involved, and that age classification has to be justified as being reasonably necessary to the operations of the TA's business in order to withstand scrutiny.

The TA's attempt to justify it rests entirely on the strenuous nature of the Station Supervisor, Level I position. But, to begin with, even if it is true that the Station Supervisor, Level I position is more physically demanding than the job of Railroad Clerk, it is not apparent, without more medical evidence, that the risk of heart problems is any more severe for people receiving what can be tendentiously described as a "daily dose of healthy exercise" than for people who, by and large, spend their days sitting in a small booth, dispensing tokens.

But even were it to be conceded that the Station Supervisor, Level I position poses a greater risk of heart problems than the Railroad Clerk position, the TA has completely failed to articulate a reason why this risk creates a business necessity to administer an EKG to all individuals over forty. To put the question sharply, what exactly would happen if a Station Supervisor, Level I were to suffer an unexpected

---

**4.** To those who would argue that the analogy between gender and age is inapposite, since being over the age of forty is an actual risk factor for coronary artery disease, the TA's own medical standards provide a ready response: the list of risk factors for coronary artery disease is comprised of "smoking, hypertension, hypercholesterolemnia, family his-

tory, *male sex*, [and] over 40 years of age." Def.'s Ex. C. 2 (emphasis added). Thus, the TA would have no more a justification to impose an across-the-board gender classification requiring EKG testing for all men seeking promotion to Station Supervisor, Level I as it did to create an across-the-board "over forty" requirement.

heart attack? While such an event would unquestionably be more than a small inconvenience to the individual himself—but, of course, this is true for any person who has a heart attack while working anywhere and cannot, without more, constitute a justification for age discrimination—there is no indication in this record that a great danger would befall either the TA's operations or the general public. The same certainly cannot be said of a police officer who collapses in the line of duty.

In the absence of some connection between an individual's calamity and the TA's business necessity, an age classification is to be shunned, even if its use can be described as rational. No compelling reason for disfavoring individualized testing has been advanced. It should also be noted that several of the TA's other listed coronary artery disease risk factors—smoking, hypertension and hypercholesterolemia—do not constitute specially protected categories under either the ADEA or Title VII and would not meet with challenges like this one should the TA elect to employ them as proxies for complete individualization, assuming, naturally, that there were a demonstrated connection between the EKG test and the qualifications for the position, which there is not. Of course, administering EKGs to all employees across the board would not run afoul of any constitutional or statutory provisions. Nor is this a case where denying the TA the power to administer the age-salient EKG test in question would impose enormous costs or create irremediable administrative difficulties for the TA.[5]

Therefore, the BFOQ exception to the ADEA is not satisfied in this case. The TA's policy is in clear violation of the ADEA, and no material issues of fact preclude this determination. Summary judg-

ment is consequently granted in favor of Epter.

## Conclusion

Simply put, where an employer believes a medical examination is required for a particular position, the test cannot be age-based unless there is a powerful case supporting such disparate treatment. Here, because the TA has utilized a facially discriminatory age classification to administer EKGs only to those over the age of forty, and because the elements of the BFOQ exception are unsatisfied here, the TA's former practice of requiring an EKG for all over-forty applicants for the Station Supervisor, Level I position constitutes a violation of the ADEA.[6] Epter's motion for summary judgment is granted. The TA's motion for summary judgment is denied.

SO ORDERED.

---

5. Whether cost or administrative difficulties alone can ever justify an age-based medical exam is an open question but need not be addressed here.

6. Epter also invokes the ADA, New York State Human Rights Law and the Administrative Code of the City of New York in his complaint, but these are not addressed by his motion.