**Jack EPTER, Plaintiff,**

v.

**NEW YORK CITY TRANSIT AUTHORITY, Defendant.**

**Civil Action No. 99–CV–3050.**

United States District Court, E.D. New York.

Aug. 22, 2002.

---

Robert W. Ottinger, The Law Office of Robert W. Ottinger, P.C., Jersey City, NJ, for plaintiff.

Joyce Rachel Ellman, Assistant General Counsel, New York City Transit Authority, Brooklyn, NY, for defendant.

## MEMORANDUM AND ORDER

TRAGER, District Judge.

In *Epter v. New York City Transit Auth.*, 127 F.Supp.2d 384, 392 (E.D.N.Y. 2001), this court found that the practice of defendant, New York City Transit Authority (the "TA"), of requiring an electrocardiogram ("EKG") for all applicants over the age of forty for the Station Supervisor, Level I ("Station Supervisor") position constituted a violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.* (1990). The issue currently before this court is a determina-

tion of the appropriate remedy. At the last conference held on July 6, 2001, the parties were asked to submit briefs addressing the following issues: (1) reinstatement of plaintiff to the position of Station Supervisor; (2) the appropriate seniority and salary if plaintiff is reinstated to Station Supervisor; (3) punitive/liquidated damages; and (4) back pay.

## Background

Plaintiff Jack Epter was originally appointed to his position as a Railroad Clerk on September 8, 1980. Def.'s Rule 56.1 Statement ¶ 1 (hereinafter "Def.'s Facts"). In May of 1992, Epter took a civil service examination to become a Station Supervisor, and his number on the Civil Service list was reached in November of 1994. *Id.* ¶¶ 2–3. At the time, the TA required all candidates seeking promotion to the Station Supervisor position to submit to and pass a physical examination. Epter's examination was administered on December 2, 1994. *Id.* ¶¶ 4, 6–7. Epter refused to undergo an EKG which the TA administered to Station Supervisor candidates under forty with a problematic medical history and to all Station Supervisor candidates over forty. *Id.* ¶ 8–9. Epter was forty-six years old at the time, Pl.'s Statement of Undisputed Material Facts Pursuant to Local Rule 56.1 Supp. Pl.'s Mot. Sum. J. ¶ 8, and so fell into the latter category of candidates. As a result of Epter's refusal, he was not promoted to the Station Supervisor position. Def.'s Facts ¶ 14. On December 5, 1994, the class of new Station Supervisors started their new positions and plaintiff was not included in the class. Def.'s Statement of Stipulated Facts ¶ 12.

On June 1, 1998, the TA eliminated the medical examination requirement for promotion to supervisory positions, *id.* ¶ 17, and on October 17 of that year, the TA promoted Epter to the probationary position of Station Supervisor. *Id.* ¶ 18. On November 20, 1998, Epter resigned from that position and requested to be, and was, returned to his old position, citing proximity to his home as his reason for preferring the prior position. *Id.* ¶¶ 19, 22. However, Epter also submitted the following statement to the TA on November 20, 1998:

> "I have patiently waited an additional 5 weeks[1] (since my appointment to Station Supervisor I) in the hope that some apparent effort would be made to set things right and correct the injustice committed almost 4 years ago. Now that my Supervisor training is complete I am unable to assume the full responsibilities of supervisor and work alongside co-workers whose salary is almost $10,000 a year higher and who can bid for preference jobs ahead of me simply because they are younger. I therefore request immediate reinstatement as Station Agent where my age will not be held against me."

Pl. Pretrial Mem. Regarding Damages, Ex. 1.

Epter seeks the following relief: (1) reinstatement to the position of Station Supervisor with retroactive seniority and salary adjustments; (2) back pay from the date of the discrimination (December 5, 1994) to the date plaintiff rejected the TA's offer to promote him to Station Supervisor

[1]. Epter refers here to the five-week period between his promotion to Station Supervisor on October 17, 1998, and his resignation from that position on November 20, 1998. On October 16, 1998, counsel for the EEOC sent the TA's counsel a letter stating Epter's appointment at the lowest salary grade was not acceptable and although the EEOC instructed Epter to accept the appointment "to safeguard" it and "in view of the imminent demise of the list to which he has been newly restored," that the EEOC expected the salary "to be upgraded as part of Mr. Epter's makewhole relief." Letter from Ann Thacher Anderson to Richard Dreyfus of 10/16/98, at Pl's Mem. Regarding Damages, Ex. 4.

(November 20, 1998); (3) liquidated damages; (4) interest; and (5) award of reasonable attorney's fees and costs. The TA argues that Epter is not entitled to any of these damages.

## Discussion

### (1)

█ The ADEA grants a claimant alleging age discrimination "such legal or equitable relief as may be appropriate to effectuate the purposes of [the act], including without limitation judgments compelling employment, reinstatement or promotion, or enforcing the liability for amounts [owing to a person as a result of the violation of the ADEA]." 29 U.S.C. § 626(b). *See McKennon v. Nashville Banner Publ'g Co.*, 513 U.S. 352, 357, 115 S.Ct. 879, 884, 130 L.Ed.2d 852 (1995) ("When confronted with a violation of the ADEA, a district court is authorized to afford relief by means of reinstatement, backpay, injunctive relief, declaratory judgment and attorneys fees"). In *Franks v. Bowman Transp. Co.*, 424 U.S. 747, 758, 96 S.Ct. 1251, 1262, 47 L.Ed.2d 444 (1976), a case involving a violation of Title VII, the Supreme Court held that reinstatement with retroactive seniority is usually necessary to make the plaintiff whole. "Adequate relief may be well be [sic] denied in the absence of a seniority remedy slotting the victim in that position in the seniority system that would have been his had he been hired at the time of his application." *Id.*, 424 U.S. at 764–66, 96 S.Ct. at 1264–1265. Likewise, back pay serves to "completely redress the economic injury the plaintiff has suffered as a result of discrimination." *EEOC v. Joint Apprenticeship Comm.*, 186 F.3d 110, 123 (2d Cir.1999) (internal quotations omitted). Unless it would result in a highly speculative award, back pay usually "runs from the date of the discriminatory action to the date of the judgment, and should include any anticipatory raises, step increases, cost of living increases, and other increases necessary to make the plaintiff whole." *Id.* at 124.

█ However, the Supreme Court has held that "the unemployed or underemployed claimant's statutory obligation to minimize damages requires him to accept an unconditional offer of the job originally sought, even without retroactive seniority." *Ford Motor Co. v. EEOC*, 458 U.S. 219, 234, 102 S.Ct. 3057, 3066–3067, 73 L.Ed.2d 721 (1982) (holding that an employer charged with discrimination in hiring can toll the continuing accrual of backpay liability under § 706(g) of Title VII by unconditionally offering the claimant the job previously denied). The Second Circuit summarized the *Ford* holding as the following: "When an employer makes an unconditional offer to reinstate an employee terminated as a result of discrimination, the employee's rejection of that offer forecloses any claim for future front pay and tolls the continuing accrual of back-pay liability under Title VII ..." *Lightfoot v. Union Carbide Corp.*, 110 F.3d 898, 908 (1997). Although tolling back-pay, the *Ford* Court did not expressly bar reinstatement. "*Ford* holds only that when a defendant in a Title VII suit provides the plaintiff with an unconditional offer of the job that was previously denied, the accumulation of back-pay damages is tolled." *Buckley v. Reynolds Metals Co.*, 690 F.Supp. 211, n. 3 (S.D.N.Y.1988).

Although the *Ford* holding was based on a Title VII claim, it has been extended to New York State Human Rights Law, *see Lightfoot*, 110 F.3d at 908 (finding that "NYSHRL substantially tracks Title VII, both in its requirement that plaintiffs mitigate their damages by seeking and accepting alternative employment ... and in the legislative purpose behind the law"), and should apply to the ADEA. *See Lorillard v. Pons*, 434 U.S. 575, 584, 98 S.Ct. 866, 872, 55 L.Ed.2d 40 (1978) (recognizing that

"the substantive prohibitions of the ADEA were derived in haec verba from Title VII"); *Geller v. Markham,* 635 F.2d 1027, 1032 (2d Cir.1980).

Epter seeks reinstatement with retroactive seniority and salary and back pay. Epter concedes that under *Ford* his back-pay remedy must be tolled because he rejected the TA's offer to promote him to Station Supervisor on November 20, 1998. Typically, the date the job is offered and the date the employee rejects the offer are the same. *See e.g. Lightfoot,* 110 F.3d 898; *Carrero v. New York City Hous. Auth.,* 890 F.2d 569 (2d Cir.1989). However, in *Epter,* the TA offered the position in October 17, 1998, and Epter rejected the position in November 20, 1998. In keeping with the spirit of *Ford,* the accumulation of back-pay damages should be tolled for Epter once the TA offered him the Station Supervisor position in October 17, 1998, because had Epter not resigned the Station Supervisor position on November 20, 1998, and continued his suit against the TA, he could have been awarded retroactive seniority and back-pay damages back to October 17, 1998, as well as from the date of the original violation, December 5, 1994. Thus, the TA must award Epter back-pay damages for the salary he would have earned as a Station Supervisor from December 5, 1994 to October 17, 1998, the date TA offered the position to Epter.

Turning to the issue of the amount of back pay, plaintiff argues that the calculation of back pay should be based on the five individuals who were assigned to the Mobile Wash division, an average total gross of $199,149. Epter bases his claim on a November 20, 1998 TA memo stating that Epter will be assigned to that division. The TA correctly points out that it is too speculative to assume that Epter would have stayed in this division for the duration of the period in question. Moreover, the Mobile Wash Unit only has supervisors

with built in over-time pay and the TA asserts that Epter, despite the opportunity to do so, never worked overtime as a Station Agent. Def.'s Memo. at 16. Accordingly, since the parties cannot come to an agreement regarding the base back pay figure, this issue will have to be resolved at trial.

As far as Epter's request for reinstatement and retroactive seniority is concerned, Epter is not entitled to retroactive seniority because he failed to mitigate his damages as required by *Ford.* Although *Ford* only addresses the tolling of back pay and, under the Second Circuit's interpretation, does not bar reinstatement, *see Lightfoot,* 110 F.3d at 908; *Buckley,* 690 F.Supp. at 211, n. 3, the logic of *Ford* is equally applicable to the question of retroactive seniority. Accordingly, Epter is entitled to reinstatement with retroactive seniority, but only as of October 17, 1998, the day Epter was offered the position.

The TA also argues that civil service laws prohibit the reinstatement of Epter. However, the Second Circuit has recognized that an individual's federal right to reinstatement can be imposed upon a municipal entity. *See Carrero,* 890 F.2d at 579. Accordingly, Epter's claim for reinstatement is not barred.

### (2)

The ADEA allows a prevailing plaintiff to recover "liquidated" or double damages in an amount equal to the employee's loss in cases of "willful violations" of the statute. 29 U.S.C. § 626(b). *See also Paolitto v. John Brown E. & C., Inc.,* 151 F.3d 60, 67 (2d Cir.1998); *Reichman v. Bonsignore, Brignati & Mazzotta,* 818 F.2d 278, 281 (2d Cir.1987).

However, the law is unsettled whether a municipality can be held liable under the ADEA for liquidated damages

since they are punitive in nature. *See City of Newport v. Fact Concerts, Inc.,* 453 U.S. 247, 101 S.Ct. 2748, 69 L.Ed.2d 616 (1981) (holding municipalities cannot be held liable for punitive damages under § 1983); *Katt v. City of New York,* 151 F.Supp.2d 313, 343 (S.D.N.Y.2001) (holding punitive damages are not recoverable under New York City Human Rights Law and discussing the costs that punitive damages would inflict on governmental entities such as the New York City Transit Authority); *Vernon v. Port Auth. of New York,* 154 F.Supp.2d 844, 860 (S.D.N.Y.2001) (asserting that "[a]lthough the Second Circuit has not decided this issue, this Court has held that the Port Authority, as a government entity, is immune from punitive damages"). *But see Stratton v. Dept. for the Aging for the City of New York,* 132 F.3d 869 (2d Cir.1997) (upholding judgment, including liquidated damages, against a municipal entity in violation of the ADEA without discussion of the liquidated damages); *Padilla v. Metro–North Commuter R.R.,* 92 F.3d 117, 123–24 (2d Cir.1996) (same).

Considering the precedent in this court, *see Fink,* 129 F.Supp.2d at 523 (imposing an award of liquidated damages against the City of New York under USERRA, which is "very similar to § 29 U.S.C. § 626(b), a provision allowing liquidated damages for willful violations under the ADEA"), and the Second Circuit's unwillingness to strike down the liquidated damages awards in *Stratton* and *Padilla,* liquidated damages would be appropriate against the TA if this case involved a willful violation. "The ADEA provision has been interpreted by the Supreme Court and the Second Circuit as requiring a showing that the employer either 'knew or showed reckless disregard for the matter of whether its conduct was prohibited by the ADEA.'" *Fink v. City of New York,* 129 F.Supp.2d 511 (E.D.N.Y.2001) (quoting *Trans World Airlines, Inc. v. Thurston,* 469 U.S. 111, 126, 105 S.Ct. 613, 624, 83

L.Ed.2d 523 (1985)). Plaintiff requests a jury trial on the question of whether the TA willfully violated the ADEA. However, the record is devoid of any evidence suggesting that the TA acted with knowledge or reckless disregard of established law. Indeed, the decision in *Epter v. New York City Transit Auth.,* 127 F.Supp.2d 384 (E.D.N.Y.2001), was based on the First Circuit opinion in *EEOC v. Massachusetts,* 987 F.2d 64 (1st Cir.1993), which was the only opinion to squarely address the issue presented in this case. Moreover, it has been noted in *Epter* that "defendants offered some evidence that suggest[ed] the generalization on which they base[d] the classification at issue may be accurate, insofar as generalizations go." *Epter,* 127 F.Supp.2d at 388–389. Accordingly, liquidated damages against the TA are not appropriate in this case.

**(3)**

 Epter also seeks prejudgment interest on his back pay award. The Supreme Court has "repeatedly stated that prejudgment interest is an element of [plaintiff's] complete compensation." *Osterneck v. Ernst & Whinney,* 489 U.S. 169, 175, 109 S.Ct. 987, 991, 103 L.Ed.2d 146 (1989) (internal citations omitted). The rationale behind prejudgment interest is "to ensure that an injured party is fully compensated for its loss." *City of Milwaukee v. Cement Div., Nat. Gypsum Co.,* 515 U.S. 189, 195, 115 S.Ct. 2091, 2095, 132 L.Ed.2d 148 (1995). As this court has noted in *Fink:* "Prejudgment interest serves to compensate for the loss of use of money due as damages from the time the claim accrues until judgment is entered, thereby achieving full compensation for the injury those damages are intended to redress." *Id.* The Second Circuit has held that the district court should take into consideration "(i) the need to fully compensate the wronged party for actual damages suf-

fered, (ii) considerations of fairness and the relative equities of the award, (iii) the remedial purpose of the statute involved, and/or (iv) such other general principles as are deemed relevant by the court." *Id.* at 526.

Epter originally sought prejudgment interest of 7.3 percent, but now seeks prejudgment interest based on an interest rate of 3.76 percent. Epter arrived at this rate by taking the "rate of interest according to the most recent publication by the Board of Governors of the Federal Reserve System" at the time judgment was entered for *Hogan v. General Elec. Co.*, 144 F.Supp.2d 138, 141 (N.D.N.Y.2001), May 21, 2001. The two alternatives suggested by the TA are a cap of 3 percent per annum and 2.10 percent. The former is based on § 1212(6) of the New York State Public Authorities Law, the authorizing statute for the New York City Transit Authority, which states that the interest rate to be applied to the Authority "shall not exceed three per centum per annum." *See New York City Transit Auth. v. State Div. of Human Rights*, 160 A.D.2d 874, 875, 554 N.Y.S.2d 308, 309 (2d Dep't.1990). The latter is drawn from the rate of interest on November 5, 2001 for a Treasury 1–year constant maturity according to the Federal Reserve Statistical Release. *See Hogan*, 144 F.Supp.2d at 141 n. 2.

■ Determining the rate to apply for prejudgment interest is at the discretion of the district court. *See Endico Potatoes, Inc. v. CIT Group/Factoring, Inc.*, 67 F.3d 1063, 1071 (2d Cir.1995). The most commonly used basis for prejudgment interest in this circuit is the interest paid on one-year treasury bills as specified in 28 U.S.C. § 1961 (2002). *See Ingersoll Milling Mach. Co. v. M/V Bodena*, 829 F.2d 293 (2d Cir.1987). Section 1961 states in relevant part: "Interest shall be allowed on any money judgment in a civil case recovered in a district court.... Such interest shall be calculated from the date of the entry of the judgment, at a rate equal to the weekly average 1–year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding the date of the judgment." 28 U.S.C. § 1961. Thus, Epter's back pay award should be divided over the appropriate time period (December 1994 to April 2002), the rate of interest referred to in § 1961 should be applied, and the interest should be compounded annually. *See Hogan*, 144 F.Supp.2d at 141 (quoting *Robinson v. Instructional Sys., Inc.*, 80 F.Supp.2d 203, 208 (S.D.N.Y.2000)) (outlining the methodology to calculate the amount of prejudgment interest).

### (4)

■ Finally, Epter requests an award of reasonable attorney's fees and costs to be determined in a subsequent proceeding. "The calculation of reasonable attorney fees is a factual issue whose resolution is committed to the discretion of the district court." *See Saulpaugh v. Monroe Cmty. Hosp.*, 4 F.3d 134, 145 (2d Cir.1993). To determine the proper amount of attorney's fees, a district court must multiply "all reasonable hours expended" by "a reasonable hourly rate." *See Clarke v. Frank*, 960 F.2d 1146, 1153 (2d Cir.1992) (citations omitted). When litigation spans a number of years, it is appropriate for the court to "calculate and apply an average historic market rate for the period in question." *See New York Ass'n for Retarded Children v. Carey*, 711 F.2d 1136, 1153 (2d Cir.1983). Plaintiff's counsel should submit a proposal for reasonable attorney's fees and costs that includes affidavits from the billing attorneys, time records, and the market rate for each year of the litigation.

## Conclusion

For the foregoing reasons, Epter should be reinstated with retroactive seniority to the position of Station Supervisor. The award for back pay damages for the salary Epter would have earned as a Station Supervisor, Level I from December 5, 1994 to October 17, 1998 is to be determined at trial. Plaintiff's request for liquidated damages is denied. The TA is to pay prejudgment interest on plaintiff's back pay award. An award of reasonable attorney's fees and costs up to this point in the litigation would be appropriate and, at the conclusion of the trial on the award for back pay damages, Epter's counsel is to submit a proposal for reasonable attorney's fees and costs that includes affidavits from the billing attorneys, time records, and the market rate for each year of the litigation.

SO ORDERED.