**Allen EPSTEIN, Plaintiff,**

v.

**KALVIN–MILLER INTERNATIONAL, INC., Defendant.**

**No. 96 Civ. 8158(PKL).**

United States District Court, S.D. New York.

April 17, 2001.

---

Jeffrey M. Bernbach, Jason Bernbach, New York City, for Plaintiff.

Clifton, Budd & DeMaria, LLP, New York City, Brian J. Clark, George P. Stasiuk, pro hac vice, for Defendant.

### OPINION AND ORDER

LEISURE, District Judge.

Plaintiff Allen Epstein commenced this action on October 31, 1996 against his former employer, Kalvin–Miller International, Inc. ("Kalvin–Miller"), alleging violations of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101, *et seq.*, the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. §§ 623(a)(1)-(2), and the New York Human Rights Law ("NYHRL"), N.Y. Exec. Law §§ 290, *et seq.* On October 15, 1998, the Court denied defendant's motion for summary judgment on all three statutory causes of action. *See Epstein v. Kalvin–Miller Int'l, Inc.*, 21 F.Supp.2d 400 (S.D.N.Y.1998). On June 21, 2000, the Court dismissed plaintiff's ADA claim with prejudice, but denied defendant's motion to dismiss plaintiff's NYHRL claims. *See Epstein v. Kalvin–Miller Int'l, Inc.*, 100 F.Supp.2d 222 (S.D.N.Y.2000).

On November 16, 2000, following a two week trial, the jury returned a verdict in favor of defendant on the ADEA and NYHRL age discrimination claims, but in favor of plaintiff on the NYHRL disability discrimination claim. The jury awarded damages to plaintiff for the NYHRL violation in the following amounts: $332,000 in back pay, $54,000 for emotional distress, and $400,000 in front pay. The defendant now moves for judgment as a matter of law, pursuant to Rule 50(b), for a new trial pursuant to Rule 59(a), or, in the alternative, for relief from the damage awards. The plaintiff moves for an order amending the judgment to include prejudgment interest on the compensatory damage award.

## BACKGROUND

In August of 1986, Kalvin–Miller, a commercial insurance broker, hired plaintiff, Allen Epstein, as its Vice–President of Finance. In this position, plaintiff was responsible for the company's financial and accounting reporting and various supervisory duties relating to office management, including oversight of human resources and the office computer systems. In 1987, Kalvin–Miller was acquired by Whitehall Financial Group. Soon after completion of the acquisition, plaintiff was promoted to Senior Vice–President of Finance, a position functionally equivalent to chief financial officer. In the new position, plaintiff became a member of Kalvin–Miller's executive committee, was regularly invited to Kalvin–Miller/Whitehall Financial Group board meetings and reported directly to Kalvin–Miller's Chief Executive Officer, David Moross.

Plaintiff testified that in or around June of 1992, after he suffered a cardiac incident that forced him to miss a board meeting, Moross informed plaintiff that he and the board had decided to hire an additional financial officer into the financial department because they feared that plaintiff "was going to die" as a result of his heart problems and leave defendant's financial department in the lurch. See Tr. at 64–65. Moross testified that although he wasn't sure if he used those exact words when he talked to plaintiff, the board and he were very concerned that the cardiac incident might render plaintiff unable to perform his duties. See Tr. at 265. Moross then testified that as the direct result of the heart incident, defendant decided to "beef up the department" by bringing in Michael Sabanos so that "in the event something else happened to Allen ... that the department would continue to operate smoothly." See Tr. at 266.

Consequently, within months of plaintiff's cardiac incident, Moross contacted Sabanos about the possibility of Sabanos becoming Chief Financial Officer. The defendant did, in fact, hire Sabanos as the Chief Financial Officer in May or June of 1993, see Tr. at 176, to whom plaintiff reported and who gradually took over a significant portion of plaintiff's duties. See Tr. at 182, 184–85. Plaintiff, Moross, and Sabanos testified at trial that Sabanos assumed responsibilities previously held by plaintiff, including supervision of the company's financial reporting and administrative functions. See Tr. at 70–71, 185, 190, 267. Sabanos also replaced plaintiff as an invitee to board meetings. See Tr. at 184–85. Plaintiff retained direct supervisory duties over only two employees.

In or about August of 1995, Kalvin–Miller was sold to American Phoenix Corporation. Following the takeover, Martin Vaughan, chief executive officer of American Phoenix, became Kalvin–Miller's CEO. Vaughan, along with Sabanos and another executive, conducted an organizational review of Kalvin–Miller with the goal of downsizing the company work force. Dianne Cassio, defendant's Human Resources Director at the time of the Reduc-

tion In Force ("RIF"), testified that she compiled information on the gender, race, age and disability status of employees and that the executives considered this information when deciding which employees to lay-off as the result of the RIF. *See* Tr. at 356–358. Cassio also testified that she was aware of laws prohibiting the use of such characteristics in termination decisions. *See* Tr. at 357.

In October of 1995, Celia Walsh, Kalvin–Miller's Financial Reporting Manager and a subordinate of plaintiff, resigned. *See* Tr. at 75. Plaintiff and Sabanos testified that plaintiff assumed Walsh's duties when she left. *See* Tr. at 75, 206. Plaintiff testified that he told Sabanos that he wanted to fill Ms. Walsh's position as the Financial Reporting Manager on a permanent basis "in order to insulate [him] from being part of the reduction in force," Tr. at 82, and that he offered to renegotiate his salary to reflect his then-current responsibilities, but that he received no response from his superiors. *See* Tr. at 84. Both plaintiff and Sabanos testified that plaintiff was fulfilling the duties of Financial Reporting Manager when he was terminated and that he was Senior Vice President of Finance in title alone. *See* Tr. at 75–76, 85, 203–204, 206–208, 214.

On March 7, 1996, plaintiff was discharged. Subsequently, in March of 1996, Kalvin–Miller hired an individual with no known disabilities as Financial Reporting Manager, at a salary of $60,000 per year. Plaintiff was not offered a new position with the company.

## DISCUSSION

### I. *Motion for Judgment as a Matter of Law*

A. *Standard*

 The Court may properly grant a motion for judgment as a matter of law under Fed.R.Civ.P. 50(b) "only if there is 'such a complete absence of evidence sup-porting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded [persons] could not arrive at a verdict against [the moving party].'" *Stratton v. Dep't for the Aging for the City of New York*, 132 F.3d 869, 878 (2d Cir.1997) (quoting *LeBlanc–Sternberg v. Fletcher*, 67 F.3d 412, 429 (2d Cir.1995)); *see also Weissman v. Dawn Joy Fashions, Inc.*, 214 F.3d 224, 233 (2d Cir.2000).

 In ruling on a Rule 50(b) motion, the Court is "required to 'consider the evidence in the light most favorable to the party against whom the motion was made and to give that party the benefit of all reasonable inferences that the jury might have drawn in his favor from the evidence. The court cannot assess the weight of conflicting evidence, pass on the credibility of witnesses, or substitute its judgment for that of the jury.'" *LeBlanc–Sternberg*, 67 F.3d at 429 (quoting *Smith v. Lightning Bolt Prods., Inc.*, 861 F.2d 363, 367 (2d Cir.1988)). "[W]hatever its own view of the facts may [be], the court [is] not entitled to substitute its view for adequately supported findings that were implicitly in the jury's verdict." *LeBlanc–Sternberg*, 67 F.3d at 430.

### B. *Burden–Shifting Analysis*

 Discrimination claims under the NYHRL are analyzed under "the familiar burden-shifting framework developed in *McDonnell Douglas Corp. v. Green.*" *Reeves v. Johnson Controls World Servs.*, 140 F.3d 144, 156 n. 9 (2d Cir.1998) (citing *McDonnell Douglas Corp. v. Green.*" 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)); *see also Song v. Ives Lab., Inc.*, 957 F.2d 1041, 1046 (2d Cir.1992); *Delta Air Lines, Inc. v. New York State Div. of Human Rights*, 229 A.D.2d 132, 652 N.Y.S.2d 253, 258 (1st Dep't 1996).

■ Under the *McDonnell Douglas* analysis, a plaintiff must first prove by a preponderance of the evidence a prima facie case of discrimination. *See McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. 1817. Once the plaintiff establishes a prima facie case, the burden of production then shifts to the employer "to articulate some legitimate, non-discriminatory reason" for discharging the employee. *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); *see also McEniry v. Landi*, 84 N.Y.2d 554, 558, 620 N.Y.S.2d 328, 644 N.E.2d 1019 (1994). If the employer articulates a non-discriminatory reason for its employment decision, the plaintiff "must be afforded the opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 120 S.Ct. 2097, 2106, 147 L.Ed.2d 105 (2000); *see also Song*, 957 F.2d at 1045. Plaintiff has the ultimate burden to prove that "the defendant was motivated by prohibited discrimination." *Sharkey v. Lasmo*, 214 F.3d 371, 374 (2d Cir.2000). "Direct evidence is not necessary, and a plaintiff charging discrimination against an employer is usually constrained to rely on the cumulative weight of circumstantial evidence." *Luciano v. Olsten Corp.*, 110 F.3d 210, 215 (2d Cir.1997); *see also Rosen v. Thornburgh*, 928 F.2d 528, 533 (2d Cir.1991) ("An employer who discriminates is unlikely to leave a 'smoking gun,' such as a notation in an employee's personnel file, attesting to the discriminatory intent.").

## 1. *Prima Facie Case*

New York courts have held that a plaintiff can make out a prima facie case under the NYHRL by showing that 1) he is disabled under the NYHRL; 2) he was qualified for the position; 3) he was in fact discharged; and 4) either that (a) he was replaced by a person who did not have an alleged disability, or (b) he was discharged under circumstances that gives rise to an inference of discrimination. *See Rosen v. Thornburgh*, 928 F.2d 528, 532 (2d Cir. 1991); *see also Citibank, N.A. v. New York State Div. of Human Rights*, 227 A.D.2d 322, 643 N.Y.S.2d 68, 69 (1st Dep't 1996); *Delta Air Lines*, 652 N.Y.S.2d at 258.

■ "It is the judge, not the jury, who must decide whether plaintiff has satisfied the requirements of *McDonnell Douglas'* s minimal version of a prima facie case, thereby shifting the burden of going forward to the defendant, as well as whether the defendant has subsequently satisfied the burden of proffering a nondiscriminatory reason for its conduct." *Sharkey*, 214 F.3d at 374. If the Court decides at the close of defendant's case that "the plaintiff has successfully made a prima facie case and the defendant has met its burden of proffering a reason other than discrimination for its actions, the court should instruct the jury that plaintiff bears the burden of proving that the defendant was motivated by prohibited discrimination." *Id.*

In its ruling from the bench on defendant's Rule 50(a) motion at the close of the evidence on November 13, 2000, the Court found that plaintiff had established a prima facie case and that defendant had proffered a non-discriminatory reason for its actions. The Court found that plaintiff established a prima facie case under the NYHRL because: (1) the parties stipulated, and the Court agreed, that plaintiff was disabled under the NYHRL at the time of his discharge;[1] (2) Sabanos testi-

---

1. In 1984, plaintiff was diagnosed with coro-

nary artery disease and hypertensive and

fied that plaintiff was qualified for his position;[2] (3) plaintiff was discharged; and (4) plaintiff was discharged under circumstances that give rise to an inference of discrimination.

■ Defendant argues that plaintiff did not establish a prima facie case because plaintiff's replacement, George Potaris, suffered from high cholesterol, which is considered a disability under the NYHRL. *See* Defendant's Memorandum of Law in Support of Defendant's Motion to Vacate (hereinafter, "Defendant's Memo") at 2, n. 2. However, the Court did not base its finding that the fourth element of the plaintiff's prima facie case was established on the hiring of a non-disabled employee. Rather, the Court based its finding on the alternative grounds for establishing the fourth element of a prima facie case, that plaintiff was discharged under circumstances that give rise to an inference of discrimination. However, given that plaintiff and Sabanos testified that plaintiff was performing the function of Financial Reporting Manager when he was discharged, the fact that plaintiff was replaced in this position with an employee that defendant did not know was disabled was one circumstance that contributed to the inference of discrimination.[3]

The Court cited two additional circumstances that contributed to an inference of discrimination: (1) the testimony by Moross that he and the board hired Sabanos to take over many of the plaintiff's duties as the direct result of plaintiff's cardiac incident; and (2) Cassio's testimony that defendant considered disability and age sta-

tus when carrying out the RIF. Although plaintiff was not fired as the direct result of the board's response to his cardiac incident or the RIF, both incidents are indicative of defendant's discriminatory motive and intent. These two circumstances, combined with the fact that plaintiff was effectively replaced by a non-disabled employee are sufficient to give rise to an inference of discrimination.

### 2. *Pretext for Discriminatory Motive*

At trial, Kalvin–Miller articulated a legitimate, non-discriminatory reason for plaintiff's discharge. Specifically, proffered evidence that plaintiff was, at least in title, in the position of Senior Vice President of Finance at the time that he was discharged, and that as part of corporate reorganization after the purchase by American Phoenix, this work would be performed by the home office. However, the Court finds that sufficient evidence was put forth at trial to support the jury's finding that the defendant's proffered reason was actually pretext for discrimination.

■ The jury could have reasonably found that, although plaintiff had a lofty title, he was performing the job of Financial Reporting Manager when he was discharged. Moross testified that defendant brought in Sabanos as the direct result of plaintiff's heart incident. *See* Tr. at 268. Plaintiff, Moross, and Sabanos testified that Sabanos assumed many of the responsibilities previously held by plaintiff, including supervision of the company's finan-

---

atherosclerotic heart disease. Plaintiff's condition requires him to take nine different medications and limits his ability to walk and engage in strenuous physical activity. In December of 1995, plaintiff was diagnosed with type 2 diabetes, a form of diabetes in which the body's ability to utilize the insulin it produces is impaired. Plaintiff takes additional medication for this condi-

tion. Kalvin–Miller executives, including Sabanos and Moross, knew of plaintiff's disabilities. *See* Tr. at 63, 238–39.

**2.** *See* Tr. at 206.

**3.** As Potaris admitted at trial, he did not disclose his medical condition to defendant when he was hired. *See* Tr. at 391.

cial reporting and administrative functions. *See* Tr. at 70–71, 185, 190, 267.

Plaintiff and Sabanos testified that plaintiff had been performing the job of "Financial Reporting Manager" from October of 1995 when Ms. Walsh resigned until he was terminated in March of 1996. *See* Tr. at 75–76, 85, 206–208. Sabanos further testified that both Sabanos and Vaughn knew that plaintiff had been performing the job of Financial Reporting Manager for several months, but decided to hire a new person to fill the position. *See* Tr. at 214. Sabanos explained how plaintiff could be performing essentially a "controller" function while retaining a lofty title by explaining, "senior vice president is a title, it's not a job. Controller is a job." Tr. at 203–204. This testimony provided a reasonable basis for the jury to conclude that plaintiff was not fired from the Senior Vice President position, but rather from the Financial Reporting position.

The jury could have then reasonably rejected defendant's proffered reason for plaintiff's discharge—that the Senior Vice President position was to be performed at the home office—because it had concluded that plaintiff was not performing the job of Senior Vice President and because the duties of the Financial Reporting Manager, the job he was performing, were not moved to the home office. Although the defendant proffered a non-discriminatory explanation for its actions, the jury was entitled to weigh the evidence, credit plaintiff's evidence, and find that the defendant's reason was pretextual.

■ A "plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated," and is sufficient evidence to "sustain a jury's finding of liability." *Reeves,* 120 S.Ct. at 2109. Accordingly, based upon a review of the evidence pre-

sented at trial, the Court can not say that the jury's findings were the result of sheer surmise and conjecture or that fair minded persons could not have arrived at the verdict. To the contrary, the record contains sufficient evidence to support the jury's conclusion that defendant discriminated against plaintiff because of his disability. Therefore, defendant's motion for judgment as a matter of law is denied.

## II. *Motion for New Trial*

■ "In ruling on a Rule 59 motion a court makes the same type of inquiry as on a motion for judgment as a matter of law, but imposes a less stringent standard." *Fowler v. New York Transit Auth.,* 2001 WL 83228, \*2 (S.D.N.Y.2001) (citing *Katara v. D.E. Jones Commodities, Inc.,* 835 F.2d 966, 970 (2d Cir.1987)). "The decision whether to grant a new trial on the ground that the verdict was against the weight of the evidence is committed to the sound discretion of the district court." *U.S. East Telecomms., Inc. v. U.S. West Communications Servs.,* 38 F.3d 1289, 1301 (2d Cir.1994) (internal quotations and citation omitted). In exercising its discretion, "[a] trial court should grant such a motion when convinced that the jury has reached a seriously erroneous result or the verdict is a miscarriage of justice," *Katara,* 835 F.2d at 970, or the verdict is "against the weight of the evidence." *U.S. East Telecomms., Inc.,* 38 F.3d at 1301. "While the Court need not necessarily weigh the evidence in the light most favorable to the non-moving party, disagreement with the verdict alone is insufficient to justify ordering a new trial." *Muller v. Costello,* 997 F.Supp. 299, 302 (N.D.N.Y.1998) (citing *Mallis v. Bankers Trust Co.,* 717 F.2d 683, 688–89 (2d Cir.1983)).

Although the standard for a Rule 59 motion for new trial is less stringent than the standard for a motion for judgment as

a matter of law, the defendants can not satisfy this standard for the same reasons cited above. The jury's findings were well supported by the evidence at trial, and the Court can not say that the jury's verdict is against the weight of the evidence or that it reached a seriously erroneous result. Therefore, defendant's motion for a new trial is denied.

### III. Consistency of the Verdicts

 Defendant argues that the jury's rejection of plaintiff's claim that he was discriminated against based on age is evidence that its finding in favor of plaintiff on his disability discrimination claim is based upon sheer conjecture. *See* Defendant's Memo at 14. Specifically, defendant argues that plaintiff's "age and disability claims depended upon virtually the same factors, namely, proof that plaintiff was discharged from the lower level, accounting manager's job, and that a protected characteristic (age and/or disability) was a motivating factor in the discharge." *Id.* Defendant overlooks the differences in the proof presented at trial for each of the claims. Most importantly, Moross's comment that the board was going to hire someone else because it was concerned that plaintiff would die was made in response to plaintiff's heart incident. The jury could reasonably conclude that this statement was probative of defendant's discriminatory intent based upon plaintiff's heart condition, but not his age.

 With regard to the RIF evidence, where plaintiff demonstrated that as part of the January 1996 reduction in force, defendant considered the age and disability status of the employees, defendant argues that the jury must have "ignored the evidence that age was considered by Kalvin–Miller in the reduction in force, while accepting identical demographic evidence to find that Kalvin–Miller considered disability in that very same layoff." *Id.* at 17. Defendant misconceives the probative value of the RIF evidence. Plaintiff was not discharged as part of the RIF. Rather, the RIF evidence was only admitted as "circumstantial evidence of defendant's discriminatory intent[,] ... to prove defendant's motive for discharging plaintiff[, and] ... to prove defendant's knowledge of plaintiff's disabilities." *Epstein v. Kalvin–Miller Int'l, Inc.,* 121 F.Supp.2d 742, 747–49 (S.D.N.Y.2000). Evidence that defendant discharged protected employees in the prior RIF "may reveal patterns of discrimination against a group of employees, increasing the likelihood that an employer's offered explanation for an employment decision regarding a particular individual masks a discriminatory motive." *Hollander v. American Cyanamid Co.,* 895 F.2d 80, 84 (2d Cir.1990). The jury could have considered the RIF evidence as evidence that increased the likelihood that defendant's offered explanation masked a discriminatory motive in general and viewed Moross's comment as revealing defendant's motive for discharging plaintiff specifically as discrimination based upon his disability, without regard for his age. Therefore, the Court rejects defendant's arguments based upon the consistency of the verdicts.

### IV. Damage Awards

#### A. Emotional Distress

 Defendant moves pursuant to Rule 59(e) for a remittitur of the emotional distress damages, arguing that the award is excessive. "If a district court finds that a verdict is excessive, it may order a new trial, a new trial limited to damages, or, under the practice of remittitur, may condition a denial of a motion for a new trial on the plaintiff's accepting damages in a reduced amount." *Tingley Sys., Inc. v. Norse Sys., Inc.,* 49 F.3d 93, 96 (2d Cir. 1995). New York law governs a district court's determination of whether a jury

verdict under the NYHRL is excessive. *See Gasperini v. Center for Humanities, Inc.*, 518 U.S. 415, 437–38, 116 S.Ct. 2211, 135 L.Ed.2d 659 (1996). Under the NYHRL, an award is excessive "if it deviates materially from what would be reasonable compensation." N.Y. Civ. Prac. L. & R. § 5501(c) (McKinney Supp.1995).

■ In determining whether a jury award is excessive, the district court should review awards in other similar cases. *See Scala v. Moore McCormack Lines, Inc.*, 985 F.2d 680, 684 (2d Cir. 1993); *see also Tanzini v. Marine Midland Bank, N.A.*, 978 F.Supp. 70, 77 (N.D.N.Y.1997) ("In determining whether a jury award is excessive under this standard, New York courts look to verdicts in similar cases."); *Fowler v. New York Transit Auth.*, 2001 WL 83228, *12 (S.D.N.Y.2001).

Defendant argues that the jury's award of $54,000 for plaintiff's pain and suffering is excessive because it is a "garden variety" type of emotional distress claim. A "garden variety" emotional distress claim is one that did not require medical treatment. *Luciano v. Olsten Corp.*, 912 F.Supp. 663, 673 (E.D.N.Y.1996) (rejecting defendant's request for remittitur of plaintiff's $11,400 emotional distress award where plaintiff testified that she had trouble sleeping, was overcome with sadness and felt purposeless), *aff'd*, 110 F.3d 210 (2d Cir.1997).

Courts differ on the amount of award that is appropriate for a "garden variety emotional distress" claim. In some cases dealing with garden variety emotional distress, courts have remitted jury awards for emotional distress to between $5,000 and $20,000. *See, e.g. Tyler v. Bethlehem Steel Corp.*, 958 F.2d 1176, 1190 (2d Cir.1992) (refusing to reduce the "extremely modest" award of $18,000 for emotional distress in age discrimination case where plaintiff testified that he was in a "state of

shock"); *McIntosh v. Irving Trust Co.*, 887 F.Supp. 662, 664–65, 669 (S.D.N.Y.1995) (remitting $219,428 compensatory damage award to $20,000 where plaintiff testified that he felt humiliated, shocked, and angry, suffered weakness in his legs, and experienced pains in his stomach and chest, but where plaintiff "did not testify in any detail with respect to the magnitude or the duration of any mental distress" and "there was no evidence that the plaintiff sought any medical or psychological help except for one visit to a doctor while he was still employed"); *Binder v. Long Island Lighting Co.*, 847 F.Supp. 1007, 1028 (E.D.N.Y.1994) (pain and suffering award of $497,738 remitted to $5,000 where plaintiff testified that his termination "was like taking a cold shower, only much worse" and that "the emotional distress was my inability to support my family"); *Quality Care v. Rosa*, 194 A.D.2d 610, 599 N.Y.S.2d 65 (2d Dep't 1993) (remitting $10,000 emotional distress award to $5,000 where plaintiff testified that she was shocked, devastated, and "in a real pickle"); *New York State Office of Mental Retardation and Developmental Disabilities v. State Div. of Human Rights*, 183 A.D.2d 943, 583 N.Y.S.2d 580, 581 (3d Dep't 1992) (remitting $75,000 emotional distress award to $7,500 where "[a]lthough in his testimony respondent described to some extent the anguish and frustration he experienced because of his employer's actions and the humiliation he felt over not being able to pay his bills, . . . this testimony was not extensive and was not sufficient").

■ However, some courts have remitted emotional distress awards to between $30,000 and $75,000 where the only evidence of emotional distress has been the plaintiff's testimony that he was distressed, even when no physical manifestations have been claimed. For example, in *Trivedi v. Cooper*, the district court remit-

ted a $700,000 emotional distress award to $50,000 where the evidence of plaintiff's emotional distress from the employment discrimination consisted of only "conclusory statements" by the plaintiff that he felt "insulted, ... indignant, ... unhappy, ... [and] emotionally upset," and no physical manifestations of the distress were claimed. 1996 WL 724743, *9 (S.D.N.Y. 1996). Similarly, in *Tanzini*, the court remitted a jury verdict for emotional distress from $170,000 to $30,000 where the evidence of plaintiff's injuries consisted solely of the testimony of plaintiff and his wife that plaintiff was "in a state of shock," traumatized, more argumentative, and having trouble sleeping. 978 F.Supp. at 78–80; *see also Lightfoot v. Union Carbide Corp.*, 901 F.Supp. 166, 170 (S.D.N.Y.1995) (remitting $750,000 emotional distress award to $75,000). Because plaintiffs have been awarded similar awards for so called "garden variety emotional distress" claims, the Court would not disturb the jury's award of $54,000 to compensate plaintiff for his emotional distress even if plaintiff's claim was a garden variety emotional distress claim.

However, plaintiff's emotional distress claim is not of the garden variety, because plaintiff's distress caused him to seek medical treatment. Plaintiff's aggravated symptoms of his heart disease and diabetes set his claim apart from a "garden variety" emotional distress claim. In *Shea v. Icelandair*, the plaintiff demonstrated that the stress caused by defendant's discriminatory acts aggravated the symptoms of plaintiff's Parkinson's disease and brought on cardiac symptoms. 925 F.Supp. 1014, 1022–25 (S.D.N.Y.1996). The court remitted the $250,000 jury award for emotional distress to $175,000, holding that the aggravation of plaintiff's physical symptoms and the severity of the emotional distress set his claim apart from garden variety emotional distress claims. *Id.* at 1025, 1029.

Similarly, here, Epstein testified that the emotional distress he suffered as the result of the discriminatory discharge aggravated his physical symptoms. *See* Tr. at 103–104. He testified that after the discharge, he had to see his cardiologist, Dr. Weisenseel, once a month instead of once every three to four months because with regard to his heart condition, his "heart was not responding well to the tension, ... [and his] evaluations on stress tests started to go down," and with regard to his diabetes, "the blood sugars started to go up ... because of the stress" *Id.* Plaintiff also testified that shortly after his discharge, he began taking Prozac, which was prescribed for his depression. *See id.* "The jury could consider all of these factors in a damage award for emotional distress even without the testimony of a physician." *Luciano*, 912 F.Supp. at 674. Because plaintiff's physical symptoms were aggravated and his emotional distress was severe, the Court finds that the jury's award of $54,000 for emotional distress was fully supported by the evidence and is reasonable.

### B. *Failure to Mitigate*

Defendant argues that plaintiff is not entitled to a back pay or front pay awards because plaintiff failed to mitigate his damages. *See* Defendant's Memo at 17. A victim of employment discrimination has the duty to mitigate his damages by "us[ing] reasonable diligence in finding other suitable employment." *Clarke v. Frank*, 960 F.2d 1146, 1152 (2d Cir.1992). "The claimant need not accept employment that is not comparable to his previous position; but if he accepts less prestigious work, his earnings from that job are subtracted from his back pay award." *Id.* Significantly, the "employer bears the burden of proving that suitable work existed, and that the employee did not make reasonable efforts to obtain it." *Id.*

■ Defendant did not present any evidence at trial that suitable work existed or that plaintiff did not attempt to obtain it. Instead, defendant argues after trial that it is "released from its duty to establish the availability of comparable employment if it can prove that the employee made no reasonable efforts to seek employment." Defendant's Memo at 18. Specifically, defendant argues that it should be relieved of its burden to prove that suitable work existed because plaintiff "never testified that he sought employment directly with any of his past employers," with Moross, or at all after he began his employment with Kimberly Hotel in mid–1996. Defendant's Memo at 20.

However, defendant admits in the same paragraph that "plaintiff proffered numerous resumes and e-mails at trial as evidence of his three-month job search via employment agencies." Defendant's Memo at 20 (citing Pl.Ex. 11, Tr. 95–101). As defendant admits, plaintiff produced evidence that he sought employment in the same industry for three months. When he did not obtain a comparable position, he accepted a position as a Comptroller for Kimberly Hotel for a reduced salary. Plaintiff was still in his position with Kimberly Hotel at trial. Once plaintiff produced evidence that he sought comparable work, defendant had the burden to prove that suitable work existed and that plaintiff failed to apply for it. *See Greenway v.*

*Buffalo Hilton Hotel,* 143 F.3d 47, 53–54 (2d Cir.1998) (employer released from burden where plaintiff terminated from bartending position but admitted at trial that he did not look for any bartending positions); *see also Clarke,* 960 F.2d at 1152 ("The employer bears the burden of proving that suitable work existed, and that the employee did not make reasonable efforts to obtain it.").[4] Here, defendant did not put forth any evidence to show that comparable employment existed and that plaintiff failed to make reasonable efforts to obtain it. Although defendant may regret its lack of attempt to put forth any such evidence, it may not now attempt to relieve itself of this burden. Defendant did not meet its burden; therefore, the Court can not say that plaintiff failed to mitigate his damages.

## C. *Reinstatement vs. Front Pay*

Defendant argues that if the Court "finds that Plaintiff should be awarded some future equitable relief, reinstatement, rather than front pay, would be the more appropriate remedy." Defendant's Memo at 26. On November 15, 2000, prior to charging the jury, the Court held a hearing to consider the parties' arguments on front pay. At this hearing, defendants argued first that front pay is an equitable remedy to be determined by the Court, and second, that if prospective relief was

4. Defendant cites *Rivera v. Baccarat, Inc.,* 34 F.Supp.2d 870 (S.D.N.Y.1999), to support its argument that it should be relieved of its burden to prove that plaintiff did not mitigate his damages because plaintiff did not present any evidence that he continued to seek comparable work after accepting the position at Kimberly Hotel. *See* Defendant's Reply at 6–9. In *Rivera,* the plaintiff testified that she initially sought comparable work after defendant discharged her, but she did not testify that she continued to seek work after accepting a lower position at Bloomingdales. The defendant in *Rivera* failed to present any evidence that comparable work existed and that the plaintiff failed to make reasonable efforts to obtain it. Magistrate Judge Francis found that the defendant failed to meet its burden of establishing that the plaintiff failed to mitigate her damages for the purposes of back pay, but relieved the defendant of the burden for front pay purposes. *See id.* at 873–74, 878. The Court declines to follow this new basis for relieving a defendant of its established burden to prove that a plaintiff failed to mitigate his damages. Rather, the Court continues to adhere to the burden allocations enunciated by the Second Circuit in *Greenway* and *Clarke.*

granted, such relief should be in the form of reinstatement rather than back pay.

The Court explained at the November 15, 2000 hearing that because "all money damages under NYHRL are legal remedies, the . . . jury would be the appropriate decision-maker for the front pay decision." Tr. 462–464 (citing *Murphy v. American Home Prod. Corp.*, 136 A.D.2d 229, 527 N.Y.S.2d 1, 2 (1st Dep't 1988)). However, because New York courts have not directly ruled that front pay is a jury question, the Court took the approach approved by the Second Circuit in *Tyler*, 958 F.2d at 1190, and "in the exercise of caution," ruled that it would treat the jury's front pay verdict "as the advisory opinion of the jury." *Id.* The Court later issued an opinion adopting the jury's front pay verdict. *See Epstein v. Kalvin–Miller Int'l, Inc.*, 2000 WL 1761052 (S.D.N.Y.2000).

Also at the November 15 hearing, the Court rejected defendant's "belated" argument for reinstatement. Tr. 465. As the Court indicated on November 15, the day on which defendant first offered to consider plaintiff's reinstatement, and the Court more fully explains below, too much animosity had developed between the parties as the result of the litigation for reinstatement to be considered a feasible option.

■■■ Under the NYHRL, plaintiffs "have a cause of action in any court of appropriate jurisdiction for damages and such other remedies as may be appropriate." N.Y.Exec.Law § 297(9) (McKinney Supp.1992). Therefore, the Court has the authority to order the equitable remedy of reinstatement if appropriate. However, the Second Circuit has instructed that reinstatement

> may not always be possible. For example, . . . the employer-employee relationship may have been irreparably damaged by animosity associated with the litigation. Denial of reinstatement in those situations, without an award of

reasonable, offsetting compensation, would leave the plaintiff irreparably harmed in the future by the employer's discriminatory discharge, and would permit the defendant's liability for its unlawful action to end at the time of judgment. To prevent this injustice a reasonable monetary award of front pay is necessary.

*Whittlesey v. Union Carbide Corp.*, 742 F.2d 724, 728 (2d Cir.1984); *see also Banks v. Travelers Co.*, 180 F.3d 358, 364 (2d Cir.1999) ("reinstatement is not always feasible . . . because animosity may impede the resumption of a reasonable employer-employee relationship. In such situations, the district court is empowered to order a reasonable monetary award of front pay."); *Padilla v. Metro–North Commuter R.R.*, 92 F.3d 117, 125 (2d Cir.1996) (same).

■■■ The Court is convinced that after five years of bitter litigation between the parties, animosity between the parties would impede the resumption of a reasonable employer-employee relationship. Defendant first mentioned reinstatement at the front pay conference on November 15, 2000. This attempt by the defendant to reconcile with plaintiff was too belated to restore the trust that is necessary for a reasonable employee-employer relationship Therefore, reinstatement is not a feasible option here. The front pay award is the only reasonable and appropriate way to compensate plaintiff for his future harm.

### D. *Salary Used to Calculate Back Pay and Front Pay*

■■■ Defendant argues that "[t]here is a serious question in the trial record as to what salary the jury could reasonably have selected as the guidepost from which to measure back pay and front pay damages." Defendant's Memo at 28. At trial, plaintiff testified that at the time that he was discharged from Kalvin–Miller in March of

1996, he was earning $142,000, which consisted of $127,000 in salary and bonus, plus $15,000 in car allowance.[5] *See* Tr. at 50. During closing statements, plaintiff's counsel argued that "Epstein testified he had a base salary of $127,500 and a $15,000 car allowance." Tr. at 544. Therefore, there was a $500 difference between the amount to which plaintiff testified and the amount his counsel argued in closing. The difference between plaintiff's Kalvin–Miller salary and his Kimberly salary would be $79,500, according to the evidence, yet it would be $80,000 according to the number used in summation.[6] Although the jury did appear to add $500 to the annual salary differential, the Court does not find that it arrived at this number due to plaintiff's counsel's mistake in closing. Rather, the Court finds that the jury followed the Court's instructions and added to the back pay award the difference between the raises plaintiff would have received at Kalvin Miller and the raises he did receive at the Kimberly Hotel.

The Court instructed the jury that an award of back pay should include "the amount that the plaintiff would have earned from the date of discharge until the date you the jury return a verdict. You must then subtract from the amount of plaintiff's lost wages and benefits that you calculate plaintiff's earnings from other sources of employment during the relevant time period." Tr. at 573.

When plaintiff began working at defendant in 1986, his compensation consisted of $85,000 in salary and bonus, plus car allowance. *See* Tr. at 42, 49. When he was discharged in 1996, he was earning $127,000 in salary and bonus, plus $15,000 in car allowance. Therefore, plaintiff received $42,000 in raises over the ten years of his employment up to his discharge in 1996, an average of about a $4,200 raise per year, and the jury could have reasonably determined that plaintiff would have continued to receive raises had he not been discharged from defendant.

Plaintiff's starting salary at the Kimberly Hotel was $60,000, and it is currently $65,000, plus a possible $2,000 bonus. *See* Tr. at 101, 105. Therefore, including bonus, plaintiff received $7,000 in raises over three years, or an average of about $2,333 per year. Therefore, if plaintiff had continued to receive his usual raises at Kalvin–Miller, he would have earned an additional $1,867 per year at defendant than at Kimberly Hotel, which could have been added to the $79,500 difference in pay. However, the jury could have reasonably concluded that given the diminution of his

5. Defendant argues that a reduced Kalvin–Miller salary should be used to calculate back and front pay awards, because plaintiff testified that he would have been willing to accept a reduced salary of $100,000 per year to remain in the Financial Reporting job. *See* Tr. at 86. However, although plaintiff offered to negotiate a new salary, defendant never engaged in such negotiations, and plaintiff never had the opportunity to discuss a lower salary with the defendant. *See* Tr. at 82–84. The jury appears to have concluded that absent discrimination, plaintiff would have been retained in the financial reporting position, without a reduction in pay, due to his high level of experience and credentials. This finding is entirely consistent with the jury's verdict, because implicit within the verdict was the jury's finding that plaintiff was discharged from the Financial Reporting position. Accordingly, the plaintiff had been performing the Financial Reporting job for several months prior to his termination with no reduction in pay. Therefore, the jury's finding that plaintiff would not have been required to take the reduction in pay is consistent and reasonable, and the Court will not disturb it.

6. Plaintiff's starting salary at Kimberly was $60,000, and it is currently $65,000. If the jury used plaintiff's average Kimberly salary of $62,500 in its calculations, then the plaintiff's difference in pay using $142,000 would be $79,500, while the difference in pay using $142,500 would be $80,000.

duties at Kalvin–Miller, had he been re-tained in the Financial Reporting position at his existing salary, that plaintiff's raises would have been lower than they had been in the past. The jury could have reason-ably added the conservative amount of $500 to the difference in pay between his position at Kalvin–Miller and his position at Kimberly. Adding the $500 brings plaintiff's salary at Kalvin–Miller to $142,500, and the difference in his pay to $80,000, the amount the jury appears to have used.[7] The Court finds this analysis to be sound and the jury's award to be reasonable. Therefore, the Court will not disturb the jury's front or back pay awards.

### E. Present Value of Front Pay

■ Defendant argues that the front pay award should be reduced to present value. The Court agrees. As the Second Circuit has explained, a "dollar in hand today is worth more than a dollar to be paid a year from today, and a dollar a year from today is worth more than a dollar to be received in two years. This basic prin-ciple of finance is employed by courts daily in calculating appropriate damage awards, to ensure that parties receive neither an undeserved windfall nor an unfair penal-ty." *McCrann v. U.S. Lines, Inc.*, 803 F.2d 771, 772 (2d Cir.1986).

The Second Circuit has recommended the use of a 2% discount rate, which repre-sents the fair rate of interest if the front pay award were invested today minus the projected rate of inflation, "as one that would normally be fair" and "authorize[d] district judges to use such a rate if the parties elect not to offer any evidence on the subject of either inflation or present value discount." *Doca v. Marina Mer-cante Nicaraguense, S.A.*, 634 F.2d 30, 40 (2d Cir.1980); *see also McCrann*, 803 F.2d at ·775 (reaffirming holding from *Doca* au-thorizing use of 2% adjusted discount rate). As the parties here elected not to offer any evidence on the subject of the discount rate, the Court will employ the 2% adjusted discount rate authorized by the Second Circuit.

The present value of the front pay award is calculated according to the follow-ing formula: "The present value of $1 payable / years from now is $1/(1+i)t$." *McCrann*, 803 F.2d at 773 n. 1; *see also Doca*, 634 F.2d at 34 n. 4. "The discounted amounts for each year are then added together to determine the total award. Standard tables are available to avoid the need for calculations." *Doca*, 634 F.2d at 34 n. 4. Accordingly, pursuant to Federal Rule of Civil Procedure 59(e), the Court hereby orders that the judgment be amended to reduce the front pay award to present value. Employing a 2% discount rate, defendant shall submit to the Court, on or before April 23, 2001, a calculation of the present value of the front pay award.[8]

### F. Pre–Judgment Interest

■ Plaintiff moves the Court to amend the judgment to include pre-judg-

---

**7.** The jury awarded $332,000 in back pay for the period of four years and two months, which was the time from which plaintiff's severance pay ended in September of 1996 through the date of judgement in November of 2000. $80,000 times four years equals $320,000, plus $12,000 for the additional two months. Plaintiff was 63 at the time of trial and testified that he intends to work until he is 70 or 72. *See* Tr. at 105. The jury appears to have decided that plaintiff would reason-ably work for five more years, and multiplied the $80,000 difference in pay by 5 years, which equals $400,000.

**8.** The jury appeared to award front pay to compensate plaintiff for the loss of 5 addition-al years of work for defendant. *See supra*, FN 7. Defendant should incorporate this assump-tion in its calculation of the present value of the front pay.

ment interest on the back pay award. The Court has discretion to award pre-judgment interest on back pay awarded under the New York Human Rights Law. *See McIntyre v. Manhattan Ford, Lincoln–Mercury,* 176 Misc.2d 325, 672 N.Y.S.2d 230, 236 (N.Y.Sup.Ct.1997) (citing *Boutique Indus. v. New York State Div. of Human Rights,* 228 A.D.2d 171, 643 N.Y.S.2d 986 (1st Dep't 1996) and *Tiffany & Co. v. Smith,* 224 A.D.2d 332, 638 N.Y.S.2d 454 (1st Dep't 1996)). Pre-judgment interest "prevents the defendant employer from attempting to enjoy an interest-free loan for as long as it can delay paying out back wages, and helps to ensure that the plaintiff is meaningfully made whole." *Gierlinger v. Gleason,* 160 F.3d 858, 874 (2d Cir.1998) (internal quotations and citations omitted). The Second Circuit has instructed that in a suit to enforce a federal right, "it is ordinarily an abuse of discretion not to include pre-judgment interest." *Id.* at 873. The same considerations compel the Court to order that pre-judgment interest be added to the award of back pay here.

 Plaintiff argues that the 9% New York statutory rate of interest should be used to calculate pre-judgment interest on the back pay award. Citing only cases decided under federal law, defendant argues that the lower t-bill rate be used. Defendant further asserts, without citing any relevant case law for its proposition and without acknowledging any of the case law that is in direct opposition to its assertion, that "[t]here is no reason" to use the New York statutory rate of interest on the prejudgment back pay award. In fact, New York courts apply the New York statutory rate of interest to calculate pre-judgment interest for employment discrimination back pay verdicts decided under

the New York Human Rights Law. *See McIntyre,* 672 N.Y.S.2d at 236–37; *see also State Div. of Human Rights v. Gissha White Plains Corp.,* 107 A.D.2d 750, 484 N.Y.S.2d 603, 604 (2d Dep't 1985). The federal cases cited by defendant where the lower t-bill rate was employed were all decided either exclusively under federal laws, such as Title VII and Section 1983, or in part under those laws, and are not applicable here. In any event, this Court has found 9% to be a proper rate to calculate pre-judgment interest even in federal cases. *See Bowman v. U.S. EPA,* 712 F.Supp. 375, 383 (S.D.N.Y.1989) (Leisure, J.). The Court finds that plaintiff is entitled to recover pre-judgment interest at the rate of 9% per annum on his back pay award of $332,000.[9] *See* N.Y. CPLR § 5004 (McKinney 2000); *see also McIntyre,* 672 N.Y.S.2d at 237. Under New York law, prejudgment interest is calculated on a simple interest basis. *See, e.g., Marfia v. T.C. Ziraat Bankasi,* 147 F.3d 83, 90 (2d Cir.1998); *Donovan v. Dairy Farmers of America, Inc.,* 53 F.Supp.2d 194, 197 (N.D.N.Y.1999). The Court finds the simple interest method of calculating pre-judgment interest appropriate here. Plaintiff shall submit to the Court, on or before April 23, 2001, a calculation of interest to be awarded on the back pay award, calculated on a simple interest basis at the rate of 9% per annum from the date his severance pay ended until the date of this order.

## V. *Conclusion*

For the foregoing reasons, defendant's motion for judgment as a matter of law is DENIED; defendant's motion for a new trial is DENIED; defendant's motion for remittitur is DENIED; defendant's mo-

---

**9.** The Court declines to rule on whether defendant's opposition papers were timely, given the Court's ruling in favor of the plaintiff

on his motion to include pre-judgment interest.

tion to amend the judgment to reduce the front pay award to present value is GRANTED; plaintiff's motion to amend the judgment to include pre-judgment interest is GRANTED.

On or before April 23, 2001, defendant shall submit to the Court a calculation of the present value on the date of this order of the front pay award, using a 2% discount rate. On or before April 23, 2001, plaintiff shall submit to the Court a calculation of interest to be awarded on the back pay award, calculated on a simple interest basis at the rate of 9% per annum from the date his severance pay ended until the date of this order. The parties shall submit any objections to such calculations on or before April 30, 2001.

SO ORDERED.